231 S.W.2d 207 (1950)
PADGETT
v.
PADGETT.
Nos. 27887, 27927.
St. Louis Court of Appeals. Missouri.
June 20, 1950.
Franklin E. Reagan, St. Louis, and A. W. Landis, West Plains, for appellant.
Mattingly, Boas & Richards, Lloyd E. Boas, and Peter W. Bauman, Jr., all of St. Louis, and Green & Green of West Plains, for respondent.
BENNICK, Commissioner.
This is an action for divorce which was brought in the Circuit Court of the City *208 of St. Louis by the wife, Mary Bay Padgett, against her husband, Clinton Christopher Padgett.
The parties had originally come from the town of Mountain View in Howell County, Missouri, where they had known each other for fifteen or twenty years before their marriage to each other on September 14, 1947. The parents of both parties had resided in Mountain View, and both of defendant's parents, as well as plaintiff's father, had died there. Defendant has immediate relatives still living in Mountain View, but the members of plaintiff's family have meanwhile established their residence in St. Louis, as has also plaintiff herself since shortly after the separation from her husband. The latter is now forty-two years of age, and plaintiff is apparently somewhat younger.
Both of the parties had been previously married. Plaintiff's former husband, to whom she had been married in 1940, had met his death while serving as a member of this country's armed forces during the late war. Defendant's former wife, to whom he had been married in 1930, had been killed in an automobile accident in August, 1946.
One child was born of plaintiff's first marriage, a daughter, Marilyn, who was four years of age at the time of plaintiff's marriage to defendant. The latter's first marriage had been childless, but he and his wife had adopted two children, the one, a girl, Carolyn, who was about eighteen months of age at the time of her adoption and is now about fifteen years of age, and the other, a boy, Eddie, who is the same age as Carolyn and was five years old at the time of his adoption.
About eight months before his second marriage defendant purchased a piece of residential property in West Plains, the county seat of Howell County, in which he and plaintiff made their home after their marriage on September 14, 1947. West Plains is a thriving community with a population of about six thousand, and is located twenty-five miles to the south of Mountain View. The marriage was followed by a honeymoon trip through certain of the southern, eastern, and New England states, and extending up into Canada. The home to which defendant took plaintiff was evidently quite commodious as he could well afford; and the other members of the household were plaintiff's daughter, Marilyn, and defendant's two adopted children, Carolyn and Eddie.
The evidence indicates that defendant is quite a prominent man in his own community. He is engaged in the hardware business, as was his father before him, and operates both a wholesale and a retail store in West Plains as well as retail stores in both Willow Springs and Mountain View. His financial worth was estimated at $150,000. All told he employs about sixteen persons. At the time of the hearing below he was serving as one of the commissioners of West Plains, which has the commission form of city government, and in addition was a member of the board of directors of the local chamber of commerce. During his residence in Mountain View he had been a member of the board of education for a period of ten years.
Unfortunately the parties' matrimonial venture did not prove successful, and a separation occurred on February 9, 1948, less than five months after their marriage had taken place. The cause of the separation was of course very much in dispute. Plaintiff testified that she left defendant because of his demand that she leave and make her home with her mother who was then living in Mountain View, but had meanwhile sold her property in anticipation of removal to St. Louis. Defendant denied any such demand on his part, and testified that plaintiff left because of her resentment over his unwillingness to have her mother come and live with them. At any rate plaintiff telephoned him shortly before she left, and late in the afternoon drove away with one of her sisters to Mountain View, where she proceeded to make her home with her mother until August of the same year, when she and her mother came to St. Louis and in conjunction with another of her sisters purchased an apartment at 4335 Shaw Boulevard, where the three of them are now residing.
Upon separating from defendant, plaintiff took Marilyn with her, and has the child with her in her St. Louis home.
*209 About the first of May following her separation from defendant the previous February 9th, plaintiff was advised by three different doctors that she was pregnant, and she so informed defendant at a conference she arranged with him in West Plains. The child, a son, whom she named Gregory Eugene, was born in St. Louis the following October, which means that the child is now approximately one year and eight months of age.
Plaintiff's marriage to defendant had caused her to forfeit a pension of $60 a month which she had been receiving from the government on account of the death of her first husband while serving in the country's armed forces during the late war, and when she announced her intention to leave defendant, he agreed to pay her the sum of $60 a month, and did make such payments during the months of February, March, and April, 1948. In March of 1948 plaintiff instituted an action for divorce in the Circuit Court of Howell County, and obtained an order requiring defendant to pay alimony pendente lite at the rate of $100 a month. Defendant complied with such order until the dismissal of such action on January 5, 1949, after which he voluntarily made payments for the support of the child at the rate of $40 a month. In addition he had paid hospital and doctor bills of from $300 to $400 which had been incurred at the time of the birth of the child; and he had been compelled to pay the further sum of $350 as attorneys' fees and suit money in connection with the action brought in Howell County.
Such action was heard in June, 1948, and then taken under advisement by the court. There is a hint in the record that a decision was postponed because of plaintiff's pregnancy. Perhaps the court was hopeful that in view of such circumstance a reconciliation might be effected if the case were not brought to an immediate conclusion. However on January 5, 1949, plaintiff appeared in court and obtained leave to set aside the submission and reopen the case; and after certain limited interrogation of her husband whom she called to the stand as her own witness, she dismissed her action without prejudice. Meanwhile a petition had been prepared for bringing an action in the Circuit Court of the City of St. Louis, and upon the dismissal of the action in Howell County she at once caused the present action to be instituted.
The petition counted upon indignities as had also the petition filed in Howell County, the only substantial difference being that the petition in the instant case was somewhat broader in its charges.
Following the hearing of the case the court granted plaintiff a divorce as prayed, along with custody of the minor child, Gregory Eugene, subject to defendant's right to visit the child at all reasonable times. It was further ordered that defendant pay $50 a month for the support of the child, and that he pay alimony to plaintiff at the rate of $100 a month, together with the additional sums of $750 for attorneys' fees and $162.30 in reimbursement of expenses incurred by plaintiff in preparation of the case for trial.
A motion for a new trial was filed and overruled. Two separate notices of appeal were thereupon filed by defendant, the one directed at so much of the judgment as granted plaintiff a divorce with an allowance of alimony, and the other directed at the portion of the judgment allowing counsel fees and suit money. Copies of the two notices were transmitted to the clerk of this court at different times, and as a consequence the case bears two docket numbers in this court, though there is but the one case before us just as there was in the court below.
Upon the institution of this action following plaintiff's dismissal of her suit in Howell County, defendant filed a motion to dismiss this action upon the ground of lack of venue based upon the contention that plaintiff no less than defendant was actually a resident of Howell County, and that her claim of residence in the City of St. Louis was colorable and fraudulent. The court heard evidence on the motion, and then overruled the same. Meanwhile the court granted leave to plaintiff to amend her petition by interlineation so as to recite that she had resided in St. Louis *210 since August, 1948, five months before her institution of the present action.
Thereafter defendant filed an answer in which he again set up the institution, hearing, and dismissal of the action in Howell County, and then charged that plaintiff's conduct with reference to the former action evidenced the fact that her institution of the present action was not in good faith, but was done for the purpose of harassing defendant and putting him to the trouble and expense of defending himself a second time against her claim for divorce, which was alleged to be wholly without merit. The court sustained plaintiff's motion to strike out such portion of the answer; and its action in that regard comprises the basis of the first charge of error.
It is to be observed that differing from the motion to dismiss, the portion of the answer stricken out was not directed to any question of venue. In other words, defendant was no longer challenging the fact that plaintiff had actually established her residence in St. Louis before her second action was brought, but instead was merely attempting to interpose as a defense that in view of the circumstances under which she had dismissed her action in Howell County and had immediately instituted the present action, she did not come into court with clean hands. What he has in mind, of course, is the fact that an action for divorce, while one at law in the sense of being provided for by statute, so far partakes of the nature of a suit in equity as to warrant the application of equitable principles.
Defendant argues that plaintiff secured the reopening of the case in Howell County by way of a ruse so that she could thereupon dismiss the case and avoid a decision which she feared would be adverse. We have no doubt that she had this very thing in mind, and that every step she took was part of a planned and prearranged procedure. But even so we fail to see how such action on her part could bar her right to a divorce if the evidence sufficed to convince the court that she was in truth the innocent and injured party. She was apparently fearful, even if unjustified in her misgivings, that her husband's prominence might react to his personal advantage in his home community. However there is no suggestion that by bringing her suit in the Circuit Court of the City of St. Louis she could have expected to gain any advantage for herself other than the opportunity to confront her husband on even terms. Defendant concedes that she had the technical right to dismiss her Howell County action without prejudice at any time before final submission, Laws Mo. 1943, p. 384, sec. 99, Mo.R.S.A., § 847.99, and her exercise of an unqualified right conferred by statute could not affect her right to bring a second action upon her claim and have the same determined upon its merits.
Defendant's next complaint is directed at the admission of evidence concerning things occurring subsequent to the separation, and particularly his failure to visit the child born eight months after the separation. It will be recalled that while the separation occurred in February, 1948, the child was not born until the following October, two months after plaintiff had established her residence in the City of St. Louis.
In the first place, we may note in passing that the judgment in a divorce action, which is triable along the lines of equitable procedure, would not ordinarily be reversed because of the admission of incompetent evidence, if otherwise sustained by competent evidence. On the contrary, the reviewing court would merely exclude any incompetent evidence from its consideration, and reach its own conclusion upon such evidence as it deemed admissible. Pickrel v. Pickrel, Mo.App., 86 S.W.2d 336.
As authority for his claim of error, defendant relies upon the decision in Hess v. Hess, 232 Mo.App. 825, 113 S.W.2d 139. However that case affords no support for his position.
In the Hess case the parties had separated in December, 1934, and never again lived together as husband and wife. In 1935 the plaintiff wife, counting upon indignities, brought an action for divorce, which the court determined against her. In *211 1937 she brought a second action, counting upon the same indignities, but proceeding on the theory that such indignities had been continuing and operative at the time the second action was instituted, and had been responsible for the fact that she had been compelled to remain separated from her husband after the former trial, which had resulted adversely. Her evidence was concededly the same as that which had been offered at the former trial, save only for evidence that subsequent to such trial her husband had made her a visit which had terminated in a call for the police, and that since the entry of the decree he had contributed nothing for her support.
The court held that error had been committed in the admission of evidence of such matters occurring subsequent to the first trial, not because such matters would in all events have been incompetent, but because in the particular case they had not been pleaded as matters constituting new grounds for divorce occurring since the decision in the original action. The court distinctly observed that if they had been so pleaded, evidence of such matters would have been admissible, but in the absence of such a plea the decree in the former suit was res adjudicata in the second action.
Of course in the present case there had been no prior decree, so that there is no question in the case of res adjudicata. The only question is as to the admissibility of evidence of matters occurring subsequent to the separation. It is obvious that defendant's failure to visit his child was no cause for the separation which had taken place eight months before the child was born. However plaintiff did not rely upon it as a cause for the separation, although she did urge it as a ground for divorce in an action which was not instituted until three months after the child was born. Moreover she specifically pleaded such matter in her petition as one of the things which had caused her marriage to become intolerable to her, and because of all of which things she asked to be released from the bonds of matrimony contracted with defendant. Evidence of defendant's failure to visit his child was therefore within the issues, although we are frank to say that his neglect in such respect does not meet with what would otherwise be its normal condemnation, since he was acting upon the express advice of his attorneys. The Howell County case was then under submission, and his counsel deemed it inadvisable that he go to St. Louis and visit in plaintiff's home so long as litigation was pending between them.
The next charge is that the court allowed excessive attorneys' fees.
On a preliminary motion for alimony pendente lite and suit money the court allowed attorneys' fees in the sum of $500, and then in its final decree allowed the additional sum of $750. The complaint is that the total allowance of $1,250 is in excess of the value of the services rendered, and far out of proportion to the sum of $350 which had been allowed for the prosecution of the case in Howell County.
The question of all such allowances to the wife in a divorce action is a matter reposing largely in the trial court's discretion which is to be exercised in the light of the wife's necessities and the husband's ability to pay. Schwent v. Schwent, Mo. App., 209 S.W.2d 546; Patterson v. Patterson, Mo.App., 215 S.W.2d 761; Baer v. Baer, Mo.App., 51 S.W.2d 873.
We have already pointed out that defendant's financial worth is in the neighborhood of $150,000. On the other hand, plaintiff's only income consists of $28.72 which she receives each month from the insurance left her by her first husband, together with the sum of $30 a month which she receives on her interest in the apartment in St. Louis. However she is required to pay $55 a month on the indebtedness incurred in the purchase of the apartment, where she makes her home along with her children. There is no suggestion that she herself has sufficient means to defray her own expenses, but only that defendant is being assessed too much. The case was sharply contested, and presents a lengthy record. The allowance was unquestionably very adequate, but in view of all the circumstances as the record shows them to be, it cannot be said to evidence an abuse of the trial court's discretion so as *212 to warrant appellate interference with the amount awarded. Burtrum v. Burtrum, Mo.App., 210 S.W.2d 364; Methudy v. Methudy, Mo.App., 238 S.W. 568; Libbe v. Libbe, 166 Mo.App. 240, 148 S.W. 460.
This brings us at last to the main question in the case of whether the weight of the evidence sustains the action of the lower court in granting plaintiff a divorce. Defendant also challenges the award of alimony, but only upon the ground that plaintiff was not entitled to a divorce, and therefore not entitled to alimony. We do not understand that he questions the amount of alimony allowed, if plaintiff was otherwise entitled to a decree in her favor.
The indignities charged against defendant were, in substance, that he indulged excessively in the use of alcoholic beverages, and frequently returned home at a late hour in an intoxicated condition; that he demonstrated a cold and indifferent attitude towards plaintiff, and failed, refused, and neglected to manifest any love or affection for her; that he was possessed of a truculent and moody nature, and when at home would refuse to converse with plaintiff; that he displayed a mean and antagonistic attitude towards plaintiff's little daughter, Marilyn, and beat and severely injured the child; that he frequently absented himself from home, and told plaintiff that he could not bear to be around her and her child; that he failed, refused, and neglected to take plaintiff to places of amusement or to make it possible for her to associate with other people; that on the day of the separation he told plaintiff that he would not live with her any longer, and demanded that she leave and go to her mother; and that after the birth of his own child, Gregory Eugene, he failed, refused, and neglected to visit the child, or to perform any of his duties and obligations as its father.
In view of the highly controversial nature of the case there can be no alternative except to make a brief statement of the evidence pro and con with respect to each of all such charges.
As for the charge that defendant indulged in an excessive use of alcoholic liquors, plaintiff testified that about two months after the marriage he began the practice of staggering home two or three times a week under the influence of liquor, and that after his return home he would go to the basement and do still further drinking. On these occasions he would be cross and cruel towards both plaintiff and her child. There was at least the smell of liquor on his breath practically every night. He promised plaintiff to quit his drinking, but failed to keep his promise. Plaintiff's mother, Hannah Becker, testified to an occasion in March, 1948, a month after the separation, when defendant called at her home in Mountain View during the time that plaintiff was living there. According to Mrs. Becker he was intoxicated on that occasion, his eyes were red, and his speech could hardly be understood.
It was brought out on plaintiff's cross-examination that no such charge had been made against defendant in the first petition filed in Howell County. On the contrary, defendant testified that during the time he and plaintiff had lived together she had never complained about his drinking, and that the first he had ever heard of any such complaint on her part was when she so charged him in an amended petition filed in the Howell County case. He denied that he had ever come home intoxicated, and testified that he never indulged in more than an occasional social drink with friends or business associates. Two of his employees testified that they had never seen him drinking at the store; and a neighbor, who regularly saw him come home each evening, had never observed him when he appeared to be under the influence of liquor.
There is much the same conflict in the evidence with respect to all such charges as that defendant was cold and indifferent towards plaintiff; that he was possessed of a truculent and moody nature; that he frequently absented himself from home; and that he refused to take plaintiff to places of amusement or to provide her with contacts with other people.
Plaintiff testified that about two or three months after the marriage, which would have been about the time defendant allegedly began his excessive use of alcoholic *213 liquor, he ceased to demonstrate any affection for her and began his practice of being away from home of evenings and Sunday afternoons on one pretext or another. He told her that he hated to come home, and that home seemed like a morgue. About the same time he quit taking her to places of amusement except for a picture show every two weeks. Attendance at church on Sunday mornings remained quite regular, but trips together to Mountain View to visit their respective relatives became gradually less frequent. He accompanied her once to a meeting of the Parent-Teacher Association, but on all other occasions she went alone. It appears, however, that these meetings were in the afternoon during business hours, which could well account for defendant's nonattendance. She recalled only one occasion when he took her to one of the local public dining places.
Defendant testified that during the period he and plaintiff lived together they went out together a great deal, and attended a picture show at least every two weeks and sometime more often. He introduced her to his friends and acquaintances on every occasion when he had the opportunity to do so. He could recall no time when he had ever refused to take her anywhere she wanted to go, and she had never complained that he did not take her out enough. As a matter of fact, they had attended a picture show together the very evening before the separation. She had an automobile at her disposal at all times, and if she desired to go anywhere of an evening, it had been his custom to go along. He denied the charge that he had been cold and indifferent towards her. He testified that during the time they lived together he was never away from home over night, and that he was only out of evenings every second Thursday, when he was accustomed to attend a meeting of the managers of his several stores. Their friends visited at their home, and he and plaintiff visited together at the homes of other people. Numerous witnesses testified that they had seen plaintiff and defendant out together, and that on all such occasions defendant was considerate of plaintiff and introduced her to people whom she did not know. Obviously such witnesses could not profess any knowledge of defendant's attitude towards plaintiff when he and she were in private. Furthermore, as plaintiff points out, such witnesses, in many instances, were either defendant's relatives or employees.
The evidence respecting defendant's treatment of plaintiff's little daughter, Marilyn, presents equally divergent pictures.
Plaintiff testified that defendant was kind to Marilyn for the first two or three months of their married life, but then became cross with the child, and if she would talk, make a noise, or neglect to eat all the food on her plate, he would shout at her, tell her "to get to hell out of here", or threaten to slap her off her chair. On one occasion he allegedly beat the child so severely with a clothesbrush that he broke the skin and caused the child's body to be black and blue for a week. He informed plaintiff that he could not stand the sight of the child; and in order to avoid giving offense, plaintiff would sometimes take the child to her mother in Mountain View, where she left her on one occasion for an entire week. He ordered the child to quit calling him "daddy", and told her that if she persisted in addressing him by that name, the previous whippings he had given her would feel like a "tap on the shoulder" by comparison with the one she would then receive. Marilyn cried and inquired of her mother why she was not to be permitted to call defendant "daddy" any more. Marilyn played in the yard with the other children, but plaintiff could recall only one occasion when defendant had ever joined in their amusements, and in that instance his attention had been wholly confined to Eddie. The child was allowed to keep her toys in a vacant room, but the room was not specially prepared as a playroom. Prior to their marriage plaintiff and defendant had discussed the subject of Marilyn's presence in the household, and defendant had assured plaintiff that he would treat the child as though she were his own.
As for the occasion of whipping Marilyn with the clothesbrush, defendant testified that plaintiff had asked him to discipline the child for some offense she had committed, *214 and that he had merely spanked her in the same manner as he did his own children. He denied that he had left any marks or bruises on the child, but claimed that after he had finished administering punishment, he had picked Marilyn up in his arms and carried her downstairs to her mother, after which there was no further discussion about the matter. He insisted that he had always treated Marilyn precisely as he did his own children. He claimed, in fact, that up until the very time of the separation Marilyn had continued to sit on his lap and call him "daddy". When visiting the store Marilyn would rush up to his desk and crawl up in his lap, and if he did not happen to be at his desk on her arrival, she would go out in the warehouse to look for him. He denied having ever demanded that plaintiff keep Marilyn out of his sight. She had been at liberty to play wherever she wished, and she not only had the spare room for herself, but she could sleep with Carolyn if she so desired. On several occasions he had gone out into the yard to play with all the children. Several of defendant's witnesses testified that they had observed him and Marilyn together, and that the relationship existing between the two was invariably affectionate.
We have already adverted to the conflict in the evidence regarding the circumstances attending the actual separation.
Plaintiff testified that defendant had demanded that she leave and take Marilyn with her, and had suggested that she make her home with her mother, although it was immaterial to him where she might go. Defendant had made his first demand about two weeks before the separation, and he repeated it at lunch the very day she left. Plaintiff had never insisted that her mother come to live with them, although defendant had at first asked her to move in after the mother became a widow in October, 1947. Later he changed his mind and thought it would not be desirable for the mother to make her home with them. Upon determining to comply with defendant's demand that she leave, plaintiff had communicated with her sister in Mountain View, and had arranged with the sister to call for her in an automobile. Defendant had assured her that if she would leave he would reimburse her for the pension of $60 a month that she had forfeited upon her marriage to him.
Defendant testified that shortly after plaintiff's mother became a widow, plaintiff began insisting that her mother be invited to live with them, and that from the very first he had taken the position that such an arrangement would not work out satisfactorily. He was not opposed to the mother coming to West Plains to reside, but had thought it best that she be established in her own home. He had always been agreeable that the mother should visit them whenever she desired, but had been opposed to the idea of her moving in permanently. Finally plaintiff announced that unless her mother should be allowed to live with them she intended to leave and make her home with her mother, and at last she did leave, although defendant remonstrated with her and told her that she was making a tremendous mistake. After plaintiff had departed, defendant found a note in which plaintiff asked, among other things, that he forgive her for everything that she had done or said that she should not have done or said. Plaintiff explained that she had had reference to defendant's complaint that she had been too harsh with him in regard to the manner in which he had punished Marilyn.
Plaintiff testified that there were four occasions after the separation when she had unavailingly attempted to effect a reconciliation. The first of such occasions was about two weeks after the separation, and in their conversation defendant had reiterated that Marilyn made him so nervous he could not endure having her in the household. The second occasion was after an additional period of two weeks, and had ended with the same result as the first. The third occasion was still a week later, and the fourth was in May after plaintiff had discovered that she was pregnant.
Defendant admitted the several meetings between himself and plaintiff, but denied that she had ever suggested a reconciliation except for one instance when she had inquired if he would be willing to have her mother come along as a member of the family. *215 Plaintiff had testified that when she had advised defendant of her pregnancy, he had laughed about it and asked "who got you pregnant." His version was that he had doubted that she was actually pregnant, but had never doubted, if she was, that he was responsible for it. He specifically disclaimed any idea that plaintiff had ever been in anywise unfaithful.
In urging that the lower court's judgment should be reversed, defendant suggests that plaintiff's own testimony was wholly uncorroborated, and that divorces are rarely granted on a party's uncorroborated testimony.
In the first place, plaintiff's own testimony was not wholly uncorroborated. On the contrary, she had corroboration, at least as to certain material features of her case, from her mother, Hannah Becker, and her sister, Goldie Becker.
The truth is, however, that there is no inflexible and absolute rule which requires a party's own testimony to have been corroborated as a prerequisite to such party's right to a divorce. Most married couples would naturally be expected, in so far as might be, to avoid airing their domestic difficulties in public, and many serious indignities might well be committed in the privacy of the home where corroboration would usually be impossible. Corroboration serves no other purpose than to add to the weight and credibility of the party's own testimony; and whether testimony shall be believed in the absence of corroboration is a matter reposing largely in the trial court's discretion to be exercised in the light of the circumstances of the case. Stevens v. Stevens, Mo.App., 158 S.W.2d 238; Ridge v. Ridge, Mo.App., 165 S.W.2d 294; Hupp v. Hupp, 238 Mo.App. 964, 194 S.W.2d 215; Lowe v. Lowe, Mo.App., 229 S.W.2d 7; White v. White, Mo.App., 180 S.W.2d 229; Mistler v. Mistler, Mo.App., 202 S.W.2d 513.
Our statement of the facts reveals very clearly why the decision in the case is not without its difficulties.
As for the charge that defendant, about two months after the marriage, began using intoxicating liquor to extreme, it would appear that if such fact were true, it could hardly have been kept a secret in a relatively small community such as West Plains, and that there would have been people in a position to testify to it. But bearing in mind defendant's prominence and influential position in his community as against plaintiff's lack of it, it is easy to understand why the townspeople might have been reluctant to come to plaintiff's aid, even if they knew the charge were true. Unquestionably the testimony of defendant's relatives and employees would have been materially affected by their relationship to and dependence upon him. Of course the same is likewise to be said of the testimony of plaintiff's own relatives, who supplied the chief corroboration she received. In other words, the testimony of each and every witness must be weighed and considered in the light of his or her own natural disposition, however sincerely entertained, to look with favor upon one party and with disfavor upon the other.
Undoubtedly plaintiff made a much more persuasive case upon her charge of defendant's indifference towards her, coupled with his alleged mistreatment of her child. He himself admits his punishment of the child with the clothesbrush. It may well be that as the glamour of his second marriage began to fade into a realization of the consequences of the obligation he had assumed, whatever affection he may at first have had for plaintiff and her child began more and more to be transformed into a resentment at their presence in his household. Indeed it would seem to be more than a coincidence that all the matters of which plaintiff complains first manifested themselves contemporaneously about two months after the marriage had taken place. From this time on, if plaintiff's evidence is to be believed, defendant's conduct towards her was of such a character as to have been subversive of the family relation.
According to defendant's theory of the case, the principal cause of the discord between himself and plaintiff was her insistence that her mother be brought in to live with them. On this feature of the case the evidence decidedly supports the view that it was never planned that the mother should *216 become a member of the household. On the contrary, it appears that upon her husband's death in October, 1947, the mother at once announced her intention to sell her home in Mountain View and go to St. Louis to keep house for her unmarried daughter, Goldie, who was living at that time in an apartment at 5173 Waterman, which she shared with two other girls. The mother did sell her home, and eventually joined in the purchase of the apartment at 4335 Shaw Boulevard; and her delay in closing the sale of her Mountain View home was due to an imperfection in her title which had to be remedied before the transaction could be completed. Meanwhile one of the girls had moved away from the Waterman Avenue apartment, and for a while Goldie paid a double portion of the rent so as to reserve a home to which her mother might come.
It is to be noted that on each and every one of the charges, plaintiff's evidence is to one effect, and defendant's evidence directly to the contrary. In some respects the one party had the greater corroboration; in other respects the corroborating evidence was the more inclined to support the other. If plaintiff's evidence is to be accepted as true on any substantial number of her charges, she is undoubtedly entitled to a divorce, but if defendant's evidence is to be believed, the decree should be reversed and the case dismissed. The problem is to determine which party is supported by the greater weight of the evidence on the whole record, and so little does the evidence for either party appear to outweigh the evidence for the other that the answer is difficult to give.
It is for just such a situation as we have before us that the law has evolved the rule of due deference which the appellate court applies where sharply conflicting oral evidence does not greatly preponderate one way or the other.
We have pointed out that an action for divorce, while comprising a statutory action at law, none the less partakes so far of the nature of a suit in equity as to be triable as such both in the trial court and on appeal. This means that whenever the appealing party challenges the propriety of the lower court's decision on the facts, the appellate court must make its own findings of fact and enter the judgment which it considers that the evidence justly warrants in the case. It is neither bound by the lower court's findings, nor does it blindly accept them as correct; and it will not hesitate to disregard them where its own consideration of the evidence impels the conclusion that such findings were erroneous. Rusche v. Rusche, Mo.App., 200 S.W.2d 577; Elliston v. Elliston, Mo.App., 215 S.W.2d 63; Taylor v. Taylor, Mo.App., 224 S.W.2d 412.
But where the oral evidence is in sharp conflict and does not greatly preponderate one way or the other, the appellate court turns to the fact that the trial judge reached his decision, not from the cold record which is all the appellate court has before it, but instead from a vantage point where he saw the parties and their witnesses and could observe their demeanor on the stand. In this situation the appellate court defers to his findings, not in the sense that it yields or abdicates its own special function, but rather in the sense that in the performance of its own function of determining where the weight of the evidence lies, it accords proper recognition to the superior opportunity which the trial judge enjoyed to ascertain which evidence should be believed. It is this circumstance, imposed upon what appears in the cold record, that enables the appellate court to conclude that the evidence of the prevailing party preponderates over that of his adversary, and leads to an agreement with the findings of the lower court. Zamzow v. Zamzow, Mo.App., 159 S.W.2d 346; Pickett v. Pickett, Mo.App., 150 S.W. 2d 587; Shea v. Shea, Mo.App., 94 S.W.2d 1102.
In this case the result depends primarily upon the credibility of the parties and their respective witnesses, and when we accord due deference to the findings of the lower court, the controversy between the parties and their witnesses must be resolved in plaintiff's favor. Defendant has made an able presentation of the points upon which he relies, but he has not convinced *217 us that the decree was against the preponderance of the evidence or manifestly for the wrong party.
It follows that the judgment rendered by the circuit court should be affirmed; and the Commissioner so recommends.
PER CURIAM.
The foregoing opinion of BENNICK, C., is adopted as the opinion of the court.
The judgment of the circuit court is, accordingly, affirmed.
ANDERSON, P. J., and HUGHES and McCULLEN, JJ., concur.