Marlan LOCKHART (Plaintiff), Appellant,

v.

William LOCKHART (Defendant), Respondent.

No. 28899.

St. Louis Court of Appeals.

Missouri.

Sept. 21, 1954.

Rehearing Denied Oct. 15, 1954.

Marvin Q. Silver, John W. Barry, St. Louis, for appellant.

William J. Hough, Clayton, for respondent.

HOUSER, Commissioner.

This is a divorce action brought by Marian against William Lockhart. The husband filed a general denial and cross bill. Both parties counted upon general indignities. Following a two-day trial the circuit court found for the husband, granted him a divorce on his cross bill and dismissed the wife's amended petition, whereupon she appealed to this court.

Appellant urges eleven "points," nine of which are abstract statements of law and quotations from decisions, presenting nothing for review under Supreme Court Rule No. 1.08, 42 V.A.M.S. Ambrose v. M. F. A. Co-operative Ass'n, Mo.Sup., 266 S.W.2d 647. Two points are properly preserved.

Appellant's first reviewable point is that the decree is not supported by sufficient evidence. This is combined with a complaint that the trial court stated that one party or the other was entitled to a divorce and directed that the evidence be confined to the question of custody of the children. This point entitles appellant to a trial anew in which we reconsider all of the evidence and reach our own findings, deferring to the trial chancellor who saw and heard the witnesses, but not hesitating to correct errors the trial judge may have made. Dallas v. Dallas, Mo.App., 233 S.W.2d 738.

Married in the City of St. Louis on June 21, 1941, the parties first separated in 1945, at which time plaintiff filed a divorce suit. Defendant convinced plaintiff that they should "try it again" and they went back together. A second separation occurred in April, 1952, at which time the wife again filed a divorce petition. Persuaded by her husband to drop the second action, the wife resumed the marital relation for a few months until October, 1952, when the parties again separated and the present action was instituted. At the time of trial in May, 1953 the wife was 29 and the husband 35 years of age. Two children were born of the marriage, a boy aged 6 and a girl aged 4, both of whom were living with plaintiff.

The wife complained that the husband continuously argued with her, struck and beat her on numerous occasions, threatened to kill her, placed a knife at her throat, repeatedly falsely accused her of going out with other men and drank to excess. She testified that he first struck her three months after marriage following a trivial argument and that these arguments were continuous— "practically every day"—through the twelve years of their marriage. He threatened her life twice between 1941 and 1946, once with a knife at her throat. He was of a suspicious and jealous nature. If she came home a few minutes late he would falsely accuse her of "being with men." That happened repeatedly. They would argue about money. His income was small, at least until the last two or three years of their married life, and he thought she spent too much money. While pregnant with her first child defendant struck her in the face, causing her to hemorrhage and to spend a week in bed under the care of a physician. After the child was born defendant kicked her on the shins while she was holding her son in her arms, causing her to cry and resulting in a black and blue shin. Commencing in August, 1947 defendant beat her every week. On Friday and Saturday nights he would come home after drinking

and beat her. She required medical attention after some of these beatings. In 1949, when five months pregnant with her second child, defendant came home drinking and began to choke her. She broke away and tried to telephone for the police, but defendant took the phone away from her, beat her and gave her a bloody nose. As a result of the beating her baby "dropped." Plaintiff was required to seek medical attention and to wear supports for the last four months of her pregnancy. During the Christmas season of 1951 she sought out her husband in a tavern and asked him to keep his promise to take the children to see Santa Claus, and to have their pictures taken. Defendant came out of the tavern in an intoxicated condition, got in the car and beat her. He beat her again after they returned home, as a result of which she fled to the home of defendant's sister, with contusions on her face, scratches and choke marks on her neck. She used pancake makeup to cover up the bruises. While plaintiff was testifying as to defendant's use of intoxicants defendant's counsel objected that he had not received a copy of the amended petition alleging the excessive use of intoxicating liquors, and refused to proceed with the trial on the original petition. After a discussion off the record the trial judge remarked: "Either one or the other of them are entitled to a divorce. Now, it's just a question of who ought to have the children, is that right? Let's proceed on the question of who ought to get the custody of the children * * * and continue the matter to another day."

A neighbor, Wilma Welch, testified that plaintiff had a nice, clean, well-furnished home consisting of three rooms and that her conduct toward her children was very good. Thelma Jackson, plaintiff's sister, testified that on some occasions defendant did not come home until 10 or 11 p. m. and on these occasions he was intoxicated; that during one period of a week he came home late every night; that when he would come in his car to her house to pick up the children he would be intoxicated; that she was present on one occasion when defendant beat plaintiff; that defendant had plaintiff on a couch and was beating her with his fist, the children screaming, and when the witness knocked on the door and defendant opened the door plaintiff "ran out and he caught her by the hair of her head and jerked her all over the porch." The children were hysterical. She testified that the difficulty was that her sister worked outside the home and she had advised her sister that "she ought to stay home and take care of her youngsters;" that they would "get along better." Mrs. Jim Ella Berry, plaintiff's cousin, testified that plaintiff's home and children were kept very clean; that when defendant undertook to discipline his children he would "yank them over and put them on a chair and make them sit there. Sometimes he whipped them * * * with his hand; spanked them with his hand."

Most of defendant's complaints about the conduct of his wife arose out of his chief objection that she insisted upon working instead of staying home and taking care of the children. She was working at the time they were married and continued to do so until the time of trial, except for the times when she was required to stay home on account of the birth of the children. Defendant tried to get her to quit her employment. At no time during their married life was it necessary for plaintiff to work in order to help support the family, according to defendant. With the children sick, and in view of the necessity of getting them up and taking them out in the cold every day and night in transferring them from one house to another while plaintiff went to work, and on account of the expense of baby sitters, defendant told plaintiff he would rather have her quit her job. Defendant begged her to quit work and offered to work not only during the day shift but also get work at night time in order to make it possible for her to remain home with the children. Although she promised to quit, she did not do so. While working at the Chase Candy Company plaintiff would come home late. One evening in 1951 she came home and told defendant she was in love with another man at the candy company and wanted a divorce. Later she worked on a night shift at McQuay-Norris Company.

She was required to leave the house at 3 to 3:30 p. m. The shift ended at 12:15 midnight. At times when she did not have baby sitters employed to care for the children she would take them to the home of her sister who would keep the children until defendant came home from his work. He would arrive any time between 5 and 10:30 p. m., depending upon whether he worked overtime. Defendant would dress the children, take them home and care for them. Instead of coming directly home after she got off from work at 12:15 midnight plaintiff would return to the home at 2, 2:30, 3 or 4 a. m. and on one occasion did not arrive home until 5 a. m. On two or three occasions defendant, plaintiff's sister and her husband went out looking for plaintiff about 2:30 a. m. On one occasion while defendant was on a vacation in Arkansas the children were found on the street at 1:30 a. m. Plaintiff's sister was called and on making an investigation in the neighborhood she found plaintiff walking alone on the street a block or two from her home. Plaintiff's explanation was that she was nervous and torn up because "she knew she was going to tell her husband the next night that she did not intend to live with him. * * * She was so upset she went out and left her two children alone in the house." Plaintiff would leave the home after defendant was asleep on Saturday nights. Four or five times a month she would leave the house after coming home from work, claiming she was going for a ride. On the occasion she returned at 5 a. m. she claimed that she had been lost in Forest Park and had slept all night in the park. Once she left the house at 2:30 a. m. "all dressed up," stating she had a date with a girl friend at a Steak 'n Shake place. Although she would be gone for two or three hours, a check of the speedometer would reveal that she had not driven more than 4–6 miles. For a time after she first started working at McQuay-Norris she wore the customary jeans and top shirt and came home regularly. "All of a sudden she started dressing up with nice blouses and new slacks and started staying out until two or three o'clock in the morning." Plaintiff frequented a nearby tavern. One evening the children were sick. They had diarrhea and were vomiting. Defendant called plaintiff at 9 or 9:30 p. m. at her place of work, informed her of the condition of the children and asked her to come home. She did not do so but merely told defendant to give them aspirin and put them to bed. Plaintiff not having returned immediately after her shift ended defendant, sometime between 1:30 and 2 a. m., called the tavern in search of her. The man who answered the telephone failed to cover the mouthpiece and defendant heard him say "Marian, do you want to talk to your husband?" The man then reported that Mrs. Lockhart was not at the tavern. Defendant threatened to have the place raided if she did not come home immediately. About 25 minutes later she arrived at the home, which was some two miles from the tavern. She admitted to defendant that after closing hours they turned out the front lights of the tavern, "and if we keep quiet they let us sit there in the back." On one occasion she left him, said she was not coming back and that defendant's mother and sister could have the children. She took a bus to Chicago, but returned the next day when her father, by telephone, threatened her with "police action for desertion." Plaintiff called defendant vile names and used vulgar language in the presence of the children over his protest. She cursed him with obscene, filthy language which she also applied to his mother. She slapped him in the face on numerous occasions. She knocked his glasses off. On one occasion she beat their small son, and when defendant asked her about it she threatened to beat him. The son was beaten with a strap until he had stripes from his shoulder blade down to the calf of his leg. He was kept out of school two days "for the welts to go down." She was "very very rough on the boy." Once when defendant was dozing off to sleep plaintiff "brought the butcher knife in" and tried to stab him but was prevented from doing so when he caught her wrist. On another occasion she loaded the shotgun and stood across the room with the hammer pulled back on the gun, menacing defendant. Defendant begged her not to shoot and finally talked her into letting the gun down. On two occasions defendant found plaintiff

downstairs in the basement with the gas jets turned on and the windows and doors closed, in an attempt to take her own life. On these occasions the children were upstairs in bed. Defendant turned over his pay checks to plaintiff who handled all of the financial transactions of the family. He claimed that she was extravagant and spent altogether too much money on her own clothing. At one time she had twenty-two pairs of shoes. She would buy dresses and soon thereafter sell them to other women at much less than she paid for them. After it became apparent to him that she was a spendthrift and wasted their money he would on occasion suggest that he handle the money. Whenever he would make this suggestion plaintiff would threaten to get a divorce. After the separation and late on a night in January, 1953 defendant went to plaintiff's living quarters in an attempt to effect a reconciliation. Although he was not drinking and had not touched her she started screaming, called the police and had had him arrested. She had him arrested two or three times during their married life.

In justification of her erratic conduct plaintiff testified that she came home late during the summer of 1952 because her husband would be waiting to argue, nag and fight with her. On an occasion when she did not come in until 4 a. m. she claimed to have been at the home of her cousin. She took the trip to Chicago "to teach her husband a lesson." She excused her absence from the home on numerous occasions on the ground that arguments with her husband made her nervous; that she left to "go for a drive * * * only to get away from a fight." She claimed that taking a ride relaxed her. She denied that the trouble with her husband was over her working at McQuay-Norris and claimed that it was necessary for her to work to pay numerous medical bills incurred by various members of the family and to pay for special diets required for the children; that her husband's earnings were insufficient to pay the bills. She said she had worked through the first five years of their married life so that they could save some money. Although she was employed during most of the twelve years of the marriage the joint assets of the parties at the time of trial was a 1949 Ford automobile and a joint savings account in the sum of $944.

Defendant denied that he quarreled with and nagged at plaintiff without cause. He denied that he regularly frequented taverns, conceding that occasionally he did go into taverns. He denied that he became intoxicated except on occasions when he and his wife would go to private parties. In particular he denied that he had ever appeared at the home of plaintiff's sister in an intoxicated condition. Admitting that he had slapped his wife, he claimed that he did so only to try to ward off her blows or after she had struck him first, but denied beating her and did not recall any occasion when his wife secured medical attention as a result of his striking her. He accounted for the black eye which she received by stating that she had fallen over some trash on the basement steps. He admitted that he directed vile language to his wife but only after she had used such language first, and stated that most of the arguments were over money. He claimed that he "treated her fine, let her handle the money," did everything in his power "to try to get along with her," and took her to places of amusement. Defendant testified that if plaintiff would come back and "straighten herself out" he would live with her again, for the sake of the children. Plaintiff, however, testified that she would never again live with defendant.

Marie Likweg, a baby sitter in the home, testified that plaintiff usually came home at 2 a. m. from work and a couple times at 3 a. m.; that twice a man came to the house and asked for her. Half the time there was not enough foodstuff on hand from which to prepare meals. She thought that the children should be fed vegetables but that all the mother wanted her to feed them was ice cream.

■■ Plaintiff testified to a set of circumstances which, if true, entitled her to a divorce on the ground of numerous indignities. Likewise, defendant's evidence re-

veals a course of conduct on plaintiff's part which was destructive of the foundation of the marital relation and if true constituted a species of mental cruelty entitling defendant to a divorce. The transcript is full of charges, denials and countercharges. The evidence on the principal contested issues of fact is conflicting and irreconcilable. The case resolves itself into the question of the credibility of the parties and witnesses. In this situation great deference is paid to the finding of the trial judge. Beldt v. Beldt, Mo.App., 240 S.W.2d 983. Having the opportunity to observe and note the demeanor of the parties and witnesses on the stand the trial judge on these highly contested issues of fact came to the conclusion that defendant was telling the truth. There are no special circumstances which lead us to any conclusion other than that reached by the trial judge. We find no reason to interfere with his findings, and on this trial de novo we reach the same conclusions.

■ Appellant complains that a divorce could not be granted because the trial court confined the evidence to the question of the custody of the children, citing Rodgers v. Rodgers, Mo.App., 279 S.W. 726. This complaint cannot be sustained. After the court made the statement referred to (on page 25 of the transcript) the trial proceeded through 175 more pages of testimony, not alone on the question of custody but on the merits as well. In the Rodgers case, supra, there was no evidence upon which the court could have taken the action of which complaint was made, while in the instant case there was ample evidence to sustain the granting of a divorce to the defendant.

Appellant contends that defendant's evidence is insufficient; that instead of revealing a course of conduct subversive of the marital relation and rendering defendant's condition in life intolerable, the record reveals nothing but trivial and insignificant troubles, arguments resulting from mere wrangling, and exhibitions of temper attributable to the lack of a conciliatory spirit in both parties. We do not so regard the testimony. Plaintiff's many acts of marital dereliction in the aggregate amount to "in-

jury accompanied with insult and amounting to a species of cruelty to the mind." Elliston v. Elliston, Mo.App., 215 S.W.2d 63, 69; Beldt v. Beldt, supra.

■ Appellant's second reviewable point is that it was error for the trial court to read reports of the deputy probation officer made on a pre-trial investigation, to examine plaintiff with respect to the contents thereof, and to cause an additional investigation to be made subsequent to the trial court's decision, all without the knowledge or consent of plaintiff. The record shows that the court read and took into consideration two reports of the deputy probation officer following visits to the home of plaintiff and of the paternal grandmother. Appellant calls attention to Rule 30B of the Rules of the Circuit Court of the Eighth Judicial Circuit, which provides that such reports shall not be considered as evidence by the court but may be used as a memorandum for the purpose of refreshing the memory of the investigator while testifying as a witness. These reports constituted hearsay evidence. Had they been offered at the trial and had an objection been interposed on this ground the court would have been obliged to exclude them. It was error for the court to read and consider these reports as a part of the evidence in this case in the absence of agreement thereto by counsel for both parties. The error, however, will not effect a reversal because the judgment is sustained by other evidence which is competent. Padgett v. Padgett, Mo.App., 231 S.W.2d 207, loc. cit. 210.

No prejudicial error appearing, the Commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, affirmed.

ANDERSON, P. J., BENNICK, J., and IVAN LEE HOLT, Jr., Special Judge, concur.