Ray F. SCHNEIDER (Plaintiff), Respondent,

v.

Myrtle B. SCHNEIDER (Defendant), Appellant.

No. 29387.

St. Louis Court of Appeals.

Missouri.

July 3, 1956.

Motion for Rehearing or for Transfer to Supreme Court Denied Sept. 14, 1956.

Tom R. R. Ely, St. Louis, for appellant.

Walther, Barnard & Walther, Hugo M. Walther, St. Louis, for respondent.

HOUSER, Commissioner.

To the petition of Ray F. Schneider for divorce Myrtle B. Schneider filed a general denial and a cross-claim for separate maintenance. The Circuit Court of the City of St. Louis found for plaintiff, granted him a divorce and dismissed defendant's cross-claim. Defendant appealed on these grounds: error in granting a divorce because plaintiff was not an innocent and injured party and the evidence was insufficient to make a case of general indignities, and error in dismissing the cross-claim and not rendering a decree thereon for defendant.

On this trial anew we reconsider all of the evidence and reach our own findings, deferring to the trial chancellor who saw and heard the witnesses, but not hesitating to correct any errors he may have made. Dallas v. Dallas, Mo.App., 233 S.W.2d 738.

The trial of this case consumed parts of 17 separate court days over a period of five weeks. Thirty-one witnesses testified. Plaintiff's exhibits were numbered from 1 to 32. Defendant's exhibits were lettered from A to LL. Many single numbered or lettered exhibits consisted of large numbers of different items, such as checks. The transcript contains 1,356 pages. The printed briefs total 203 pages. The transcript, exhibits, printed statements, briefs and arguments have been carefully scrutinized, read and reviewed. The oral arguments of able counsel have been weighed. Considerations of time and space prohibit a detailed chronology of the indignities each of the parties litigant charged against the other or of the denials, explanations, or differing versions of various incidents as offered by each of them and as developed in this four volume record.

The parties were married on September 15, 1944. Except for a three month separation in 1947 they lived together continuously until March 14, 1954, a period of 9½ years. At the time of the marriage plaintiff was 51 years old. He had a 22-year old son by his first wife, who died in 1940. Defendant, 50 years old, had been married and divorced three times previously. In each instance she had been adjudged the innocent and injured party.

*Plaintiff's version of the facts:* Every day during the entire period that plaintiff lived with defendant he was laboring under tension created by her. There was a bickering atmosphere in the home. She nagged and quarreled with him in matters of insignificance, criticised his language, required him to take off his shoes before coming into the house. She went into tantrums, sometimes engaging in violent physical attacks upon him. At least once a week she would yell and scream at him until 2:00 or 3:00 o'clock in the morning. She made his 22-year old son uncomfortable by telling plaintiff, within hearing distance of the son, that the latter was a permanent, uninvited and unwelcome guest for whose presence she had not bargained. She speculated that $10,000 had been spent on the son's college education while she lacked money to buy the things she wanted. She criticised the son's use of the electric lights and discouraged him from bringing his friends to the home. She expressed her displeasure by telling plaintiff that if he liked his son so well he could live with him,

whereupon she took the bed clothing off the son's bed, threw it on the floor in plaintiff's bedroom and retired to the son's room. Presently she returned to plaintiff's bedroom and said, "If you think you can freeze me out, you are crazy." Defendant, upon finding plaintiff and his son talking in a low tone on one occasion, asked, "What are you two conspiring about?" When plaintiff told her that they were discussing the purchase of Easter flowers defendant answered, "I think you are a damned liar." Following an argument in 1946 defendant took a .38 Colt revolver out of a dresser drawer, cocked and pointed it at plaintiff, who was in bed, and stated that she was going to kill plaintiff and his son. The son finally moved out, for his own peace of mind and to remove any obstacle to the success of his father's marriage. In 1947 plaintiff separated from defendant. Reconciled after a three month separation plaintiff returned to the home on condition that defendant quit her tantrums, be reasonable about expenditures and have no more charge accounts.

Plaintiff was president of a successful business corporation with which he had been connected for forty years. His secretary was a Mrs. H, a widow of his own age who had worked for him for twenty years and for the company for thirty years. After the death of his wife plaintiff occasionally took Mrs. H out socially to card parties, restaurants, etc. and once took her and his son on an overnight plane trip to Chicago. For years plaintiff had taken her to and from work in his automobile. More than six months prior to the marriage he had given her some jewelry including a cluster ring, but they were merely old friends and there was never any intimacy between them. From the outset, however, defendant was jealous of Mrs. H. She forbade plaintiff from taking Mrs. H to and from work. She developed the notion that plaintiff was the father of Mrs. H's grown daughter, although the child was two years old at the time plaintiff first met Mrs. H. Defendant also suspected that plaintiff had bought the home in which Mrs. H lived, a wholly mistaken idea. Defendant told other women that plaintiff was unduly attentive to Mrs. H, wondered what "hold" Mrs. H had over plaintiff, and repeated to her women friends her suspicion that plaintiff was the father of his secretary's child and that plaintiff had bought a home for his secretary. A Mrs. W, the widow of a former officer of the company, was a member of the board of directors. Plaintiff had known her for years and customarily had taken her in his automobile to and from meetings of the board. Defendant objected to this practice, exhibited jealousy of Mrs. W, accused plaintiff of spending too much time with and paying too much attention to Mrs. W. Defendant required him to call Mrs. W on the telephone and cancel arrangements for transportation to a board meeting, saying, "I wish you would be as much of a gentleman to me as you are to Lydia." One evening defendant invited one of her friends, a Miss F, to dinner. The guest had car trouble and came to the door seeking assistance. Plaintiff went with Miss F to get her car, which was stalled a few blocks away from the Schneider home. Later defendant inquired of plaintiff what he and Miss F were doing over on the road and accused him of "putting on a party" with her. Defendant mentioned to one Mary B that she thought plaintiff was overly attentive to Miss F on that occasion. Defendant accused plaintiff of trying to be friendly with and "making passes at" Mrs. P. The Ps were the closest and most intimate friends of the Schneiders. Once defendant and Mrs. P were horseback riding when the girth on defendant's horse became loose and the saddle slipped. Defendant accused plaintiff and Mrs. P of conspiring to kill her by having her thrown to the road and stated that they wanted to be "free to carry on." On one occasion while dining out with friends

plaintiff and defendant were introduced to two strange couples and the whole group went to the Schneider home. One of the guests, a student of dramatics, gave an impersonation of a movie star in the course of which, without intending anything personal, she looked at plaintiff and said, "I love you." This apparently incensed defendant because she told two of the women guests who were behind the bar in the rathskeller that it was "verboten" to go behind the bar, and embarrassed plaintiff by announcing that the party was over and by ordering the guests out of the house. The parties had been very friendly with the Ms, neighbors who lived across the street. One night Mrs. M started home after visiting the Schneiders. She had no leash for her dog and plaintiff volunteered to carry the dog across the street for her. Defendant followed them. Upon delivering the dog plaintiff was embarrassed to find defendant standing behind him, not ten feet distant. As he walked in the kitchen defendant slapped him and hit him in the back of the neck with her fist, told him that he "had a lot of nerve taking that woman over on that dark porch;" accused him of being "up to his old tricks, carrying on with every woman." As plaintiff was preparing to retire defendant charged into him "swinging like a wildcat," in a fit of temper. In the encounter he pushed her aside and she fell on the bed. The parties on one occasion had dinner at Edmonds with the Ps and Mrs. P's elderly aunt, who was some ten or fifteen years older than plaintiff. In the middle of the dinner defendant, apparently jealous of the aunt, jumped up, walked out of the restaurant and sat in the automobile, thus spoiling the evening for plaintiff. Defendant displayed her temper at Schober's restaurant on an occasion when plaintiff did not reach the automobile as soon as she thought he should. In the presence of other friends she asked plaintiff "What the hell took you so long?" To his explanation that he was waiting for change she responded, "Oh, the hell you say." While the Schneiders were visiting the Ps on one occasion the latter had an argument in the course of which Mrs. P, who had been previously married, said that a woman only loves her first husband. Defendant demurred, saying that she had had four husbands and that she loved plaintiff dearly. Plaintiff answered that it did not look like it, considering the way she treated him, whereupon defendant hit plaintiff with a meat platter, broke his glasses, cut his head, threw eight or nine dishes at him and threw food all over his clothes. Mrs. P grabbed and held her. Other instances in which defendant exhibited a bad temper were given in evidence. Plaintiff had to quit his lodge connections because "every time I went out at night I was supposed to be with another woman." He gave up the meetings of the National Metal Trade Board for the same reason, and was accused of being too familiar with a Mrs. Henry when they had dinner at a hotel in January, 1954. Defendant repeatedly made false and derogatory statements about plaintiff. For example, she told her sister-in-law she wished plaintiff was more like his brother, who was "more generous." She told lady friends at afternoon bridge parties that her husband was "tight" and would not give her money for the things she wanted. The parties dined in public restaurants frequently, from two to four times a week. Part of the time plaintiff was agreeable to this arrangement, desiring to keep things on a pleasant basis, but at other times when he did not want to go out to eat, defendant would insist. "Most of the time" there was an ultimatum from defendant that "if he wanted to eat he had to go out." Defendant's use of money and credit caused plaintiff constant annoyance and embarrassment. Successful in business, plaintiff enjoyed a comfortable income. In 1944 he earned $8,000. His average annual income from 1945 to 1953, both inclusive, was $18,878. He willingly spent money freely for housing, household expenses, vacation trips, dinners

and entertainment and handsome gifts for defendant. Plaintiff gave checks to defendant or paid bills for her own uses in amounts averaging more than $2,700 per annum during the years 1950 to 1953, both inclusive. During the last two and a half months of their married life these personal sums on behalf of defendant amounted to $1,419. He was agreeable to reasonable expenditures for defendant's personal needs but he wanted to know before she spent money how much was to be spent. Shortly after the marriage defendant bought three suits of clothes in three months for $150, and plaintiff had to take over the household bills. One of the terms of the 1947 reconciliation was an agreement that defendant have no more charge accounts, but within two weeks after they went back together she tried to open a charge account at a department store. Early in the marriage defendant asked and obtained plaintiff's consent for a check for a Persian lamb coat for $1,000. She then purchased one for $1,500 without plaintiff's knowledge and charged the difference to plaintiff's account. In 1952 plaintiff gave her $816 for a Mink stole, whereupon defendant purchased one for $1,200 and charged the balance to plaintiff's account. On numerous occasions defendant bought expensive items of clothing and charged them without plaintiff's knowledge. After futile efforts to collect from defendant the creditors, collection agencies and lawyers would present bills to plaintiff for payment and send "tough" collection letters. Legal action was often threatened on bills of which plaintiff had no previous knowledge. Sometimes these bills would be a year or two years old before he ever heard of them. The first plaintiff would know of bills would be when somebody called him and "hounded" him for payment. Plaintiff would pay the bill and request that the shop not charge anything else to his account. This happened over and over. When defendant would leave the city for even a short trip she was always careful to stop mail deliveries at the house. When she answered the telephone she would disguise her voice. Defendant would tell her women friends not to mention purchases of new clothes or jewelry in front of plaintiff. She bought a table and told plaintiff that it was being kept for a lady friend. She urged another lady friend to charge groceries at Straub's on plaintiff's account and then pay defendant in cash. Defendant did not want to talk with plaintiff about excessive expenditures of money, saying that she was going to spend whatever she wanted. When he spoke to her about paying off the loan on the house, she said, "To hell with it; you only live once." Practically every time he made his income tax return plaintiff had trouble getting defendant to sign the joint return. She always wanted time to "think it over," and would often delay a whole day. When he would hand her the return in the morning it would remain unsigned all day until 10 or 10:30 p. m. Plaintiff felt it necessary to take the precaution of preparing an individual return at each return date for use in case she should refuse to sign the joint return. One year defendant refused to sign the joint return until plaintiff agreed to pay her a substantial sum. She asked for and he later paid her $500 for her signature. On March 14, 1954 at 9:30 a. m. he requested her to sign the return. Again at 1:30 p. m. he repeated his request. At 3 p. m. he made the request a third time. Defendant then asked him to pay her money to sign the return. It was this attempt to "shake him down" that produced the final separation.

*Defendant's version of the facts:* Defendant loved plaintiff, wanted to make a success of the marriage. She worked for six months after the marriage at photo refinishing, using her earnings to purchase furniture and accessories for the home. She was considerate and affectionate to his relatives, and especially his son, to whom she faithfully tried to be a good mother, mending his clothes, introducing him to girls, and welcoming into the home his friends, for whom she prepared cocktail and dinner parties, and assuring him that as

long as he lived in St. Louis they would want him to live with them. She manifested her love for plaintiff by overlooking his moodiness, periods of silence and sulkiness when he would sometimes go for two weeks without speaking to her, excessive drinking, nagging, quarreling and critical attitude concerning minor matters. In spite of these things the parties got along very well together. Most of the time they had a happy life. They took vacation trips to the Ozarks, Kentucky Lake and other resorts, went to many dinner parties together, dined together, slept together, worked around the house together and enjoyed their home life. Plaintiff, however, associated with Mrs. H over defendant's protest, after promising faithfully to discontinue the practice of taking her to and from work. Plaintiff told defendant before the marriage that he had had intimate relations with her for four years. Because of Mrs. H plaintiff wanted to keep the marriage a secret, as a consequence of which they continued to live in their own separate quarters for three weeks after the marriage. He was openly familiar with other women. He complained about the bills, embarrassed defendant by making untruthful and uncomplimentary statements to close friends and relatives about defendant and her character, and accused defendant of marrying him for his money. On one occasion he struck her, broke her glasses and blackened her eye. Concerning defendant plaintiff made the following statement to a guest: "To hell with Mrs. Schneider, she has nothing to say around here, you just do as you please." Plaintiff told defendant that he hated her and would do anything in the world to get rid of her; that he would lie about her until she wouldn't be able to hold her head up in St. Louis County; that no matter what she did she would be in the wrong because she had been married three times before. He used obscene and vile language and called her "ugly names." He would become angry and tell her to "shut up." He called her a liar in the presence of her friends, to her embarrassment. He broke his promise to make her a joint beneficiary of his life insurance policies, with his son. When they bought their house he made a loan on his life insurance for the down payment. Later he asked her to agree to transfer the loan on the life insurance (in which she had no interest) to a mortgage on the house, which was held in their joint names. He refused to give her a key to his safety deposit box, although he gave a key to his son. He refused to establish a joint checking account, saying that it was none of her business. He never allowed her to know anything about the financial side of the marriage. She was not extravagant, but dressed and furnished her home modestly. He was niggardly with her. He gave her a personal allowance of $20 a week for incidentals but failed to support her in the manner in which she was entitled to live, considering his income, failed to provide essential furnishings and quarreled with her for alleged extravagance although he was liberal, indeed lavish, in making expenditures for his own personal wants. He embarrassed her by cutting off her credit at a department store. He concocted false stories, such as the loaded gun episode, never gave her cash, but always paid more to her by check, "even to the penny, for anything over and above her allowance," kept books on her expenditures, and distorted and magnified domestic incidents, all in pursuance of a scheme or plan to get rid of defendant. At the time of the first separation he took with him silver, dishes, linen, furniture and many things, including some wedding presents from the house, things which were never returned. When she desired to shop for roadside wares on a fishing trip he refused, telling her it was "junk" and that it was silly to take such stuff home. He would become angry, make sarcastic remarks and on an occasion when she was in the hospital with a bone stuck in her throat he exhibited complete indifference about her condition. After getting a television set he never again took her to a picture show or other place of amusement, except when they were

invited out. He had a bad temper. He physically abused the dog, against her wishes. On one occasion he jumped into a swimming pool fully clothed. He drank too much, and on occasions in the presence of guests, became sick and made a nuisance of himself as a result of overindulgence in the use of liquor.

■ Without more, suffice it to say that each party denied, minimized or sought to explain away every incident or episode of which the other complained. Much of the testimony was in diametric opposition to other testimony in the case. Depending upon which side was telling the truth plaintiff was either generous or penurious, friendly or hostile, a sober man and an occasional social drinker or an intemperate and hard drinking man, patient and gentle or impatient and violent, nagging and quarrelsome or quiet and agreeable, truthful or untruthful, faithful or unfaithful, unduly familiar with other women or perfectly innocent in this respect, and he either loved or hated defendant, treated her with respect and as a companion or with contempt and made false and humiliating accusations. Likewise, defendant was either a loving and considerate wife and pleasant companion who made a wonderful home for plaintiff and for his son, or she was a deceitful, greedy, selfish, grasping, jealous, violent and extravagant adventuress. This is precisely the situation in which the rule of deference to the findings of the trial judge is peculiarly applicable. Lockhart v. Lockhart, Mo.App., 271 S.W.2d 208, loc. cit. 213; Beldt v. Beldt, Mo.App., 240 S.W.2d 983, loc. cit. 990. The trier of the facts had a prolonged and an unusual opportunity to observe the conduct and demeanor of the parties and their witnesses and to weigh, evaluate and assess their testimony. Considering his superior advantage in this respect in contrast with our comparative disadvantage in reading the cold record, giving credit for his years of experience in trying issues of fact, and considering the evidence, the character of the parties, their reliability

or unreliability, the probability or improbability of their strikingly different versions of the facts and the extent and type of corroboration offered by the respective parties, we accept and approve the findings of the trial judge in favor of plaintiff and that plaintiff is the innocent and injured party; that defendant did not make a case for separate maintenance, and on this trial de novo we arrive at the same conclusions reached by the trial court.

It is objected, however, that the acts proved were not of sufficient gravity or continuity to constitute indignities within the meaning of the law, but were light and inconsequential; that the "slight friction" which occurred in this household did not amount to a course of conduct in which defendant manifested dislike, settled hatred and estrangement and alienation amounting to a species of mental cruelty. Accepting, as we do, plaintiff's version of the facts, we are of the opinion that defendant's breaches of marital duty and indignities as revealed by this record are of sufficient character, gravity and continuity to constitute such a course of conduct and to make plaintiff's condition intolerable within the contemplation of Section 452.010 RSMo 1949, V.A.M.S.

■ Defendant asserts that plaintiff's own conduct precludes him from obtaining a divorce; that he was not an innocent and injured party because he secretly schemed to rid himself of his wife and strip her of any marital rights to his property, persisted in having relations with Mrs. H in defiance of defendant's wishes, struck and injured her, and was guilty of numerous marital breaches carefully detailed. The difficulty with this assertion is that the facts upon which it is based have not been proved. Some of the facts advanced have been *testified to* by defendant but they have not thus been *established*. Most of them rest on defendant's own testimony which has been contradicted by plaintiff's testimony and that of other witnesses for plaintiff. Plaintiff did admit

some shortcomings, e. g., that he was angry when he came home and found that defendant had sold the dining room furniture and bought another set; that he may have done things that started quarrels; that he would walk out of the room occasionally and would not talk; that he was irritated over the time defendant took to review the income tax returns; that he was not pleased about the bills, and was irritated by her request that he wipe his feet before coming into the house. He conceded that he had made some sarcastic remarks on a fishing trip. The sum of all of these, together with other failings confessed by him, however, would not entitle defendant to a divorce if she were applying for that relief. It is not required, as a prerequisite to a divorce, that a plaintiff's conduct be letter-perfect or above all reproach. Bressie v. Bressie, Mo.App., 266 S.W.2d 24; Scheer v. Scheer, Mo.App., 238 S.W.2d 865.

■ Defendant complains of error in approximately twenty instances in the admission of incompetent evidence and in refusing to strike the answers to certain objectionable questions. There is no occasion to rule these questions seriatim because a divorce judgment will not be reversed for errors in the admission of incompetent evidence where, as here, the judgment is sustained by other evidence which is competent. Lockhart v. Lockhart, supra; Padgett v. Padgett, Mo.App., 231 S.W.2d 207, loc.cit. 210.

■ Finally, there was no error in dismissing defendant's cross-claim for separate maintenance. Neither of the essential elements of such a cause of action, abandonment without just cause and failure to support, Herbig v. Herbig, Mo.App., 245 S.W.2d 455; Kendrick v. Kendrick, Mo. App., 251 S.W.2d 329, was shown.

Consequently, the judgment of the circuit court should be affirmed and the Commissioner so recommends.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is accordingly, affirmed.

ANDERSON, P. J., RUDDY, J., and HUNTER, Special Judge, concur.