233 S.W.2d 738 (1950)
DALLAS
v.
DALLAS.
No. 27848.
St. Louis Court of Appeals, Missouri.
November 2, 1950.
*739 Ennis & Saunders, Festus, for appellant.
J. W. Thurman, Hillsboro, for respondent.
HOUSER, Judge (sitting by order of the Supreme Court.)
This is an action for divorce which resulted in a decree for the plaintiff husband in the trial court. Christopher M. Dallas filed his petition on November 30, 1948, charging his wife, Emma J. Dallas, with general indignities and desertion. The defendant moved to dismiss the suit on the ground that the action was barred by a prior judgment of the same court in her favor and against her husband in a suit for separate maintenance. The motion to dismiss was heard, evidence taken and the motion overruled. The wife then filed her answer denying generally and specifically the charges of indignities and desertion and affirmatively pleading the judgment of October 29, 1943, in the separate maintenance *740 suit as a defense. Following the granting of a decree of divorce to the plaintiff the defendant filed a motion for a new trial and upon the overruling of that motion defendant perfected this appeal.
Three grounds for reversal urged in the motion for a new trial are briefed: (1) that plaintiff did not establish that he was the innocent and injured party and that the trial court erred in granting him a divorce; (2) that plaintiff failed to prove such indignities as to render his condition intolerable; and (3) that the case was res adjudicata.
Having raised these points, appellant is entitled to a review of the evidence by this court, which is obliged to reach its own conclusions as to the very right of the matter and affirm or reverse according to the requirements of justice under the law. In approaching this task, it is our duty to accord due deference to the conclusions reached by the trial judge, who, from his vantage point as the impartial appraiser of the personalities, demeanor and conduct of the parties and their witnesses in the courtroom, had an opportunity far superior to ours to separate the wheat from the chaff and ascertain the truth. On the other hand, if it plainly appears that in spite of this advantage the trial judge has not arrived at the proper result, we must not hesitate to correct the error.
These parties were married on February 26, 1940, and finally separated on July 21, 1943. This was the defendant's third marriage, the first two having terminated in decrees of divorce granted on her application. She had grown children by her previous marriages. No children were born of the marriage of plaintiff and defendant.
Plaintiff testified for himself and produced three neighbors and a fellow factory worker to support his contentions.
Plaintiff testified that although he treated his wife with love, kindness and affection ("the best I possibly could"), provided a home for her, worked steadily, and gave his pay checks to her, she would not stay with him but "picked up and left" him. He said that sometimes she treated him "pretty nice" and that "lots of the time" they "got along pretty good" but that she "probably" did a lot of things wrong. He complained that she would go into a tantrum, "get her dander up," and throw "dishes and things" on the table.
One of the principal points of difference between this couple revolved around a butcher knife incident in which plaintiff contended that his wife threatened to commit suicide and that in an effort to keep her from cutting her throat he received a cut on his fingers as he grabbed for the knife. He claimed that one of his fingers was stiff as a result of the injuries then sustained.
The defendant's version of the butcher knife scene depicted plaintiff as an aggressor intent upon killing her, who chased her around a table, and defendant accounted for the injuries by saying that in the melee she gripped the knife and he suffered a cut on his hand. The defendant testified that this trouble arose out of the fact that one of her former husbands, the father of her youngest daughter who was living in the home of the parties, came to visit his daughter and that plaintiff resented the presence of the other man. She said plaintiff was jealous and demanded that she direct her former husband to leave the place; that she hesitated to do so and when she tried to placate him, he threatened to kill her and got the knife.
Plaintiff said his wife quarreled and nagged at him without excuse; that he was of German extraction; that she cursed him and called him bad names, such as "old Hitler son of a b_____" on numerous occasions. The wife admitted calling him "Hitler" and "Hitler S.B."; expressed the hope that God would forgive her for it; tried to excuse this misconduct on the ground that he had treated her "so dirty" and had tried to cut her throat and stated that it was on that occasion that she called him these names.
Plaintiff described defendant's actions in running out into the yard and "hallooing" to the neighbors for help. When asked for an explanation she informed plaintiff that her lawyer had "told her to do that." The wife assured the court that she had run out into the yard and called on the *741 neighbors for help, but gave as her reason that he struck and abused her and caused her to flee from the home on these occasions. She denied that her lawyer had advised her to run out and "halloo" and denied that she had so informed plaintiff.
There was a good deal of testimony with reference to property rights. Plaintiff claimed that they had trouble over the property which consisted of a home which was mortgaged and certain sums of money. He said that at his wife's request he had "put her name in the deed" giving her a half interest in the residence. Defendant admitted that she had told her husband that she wanted her part of the property, a "wife's part," but she was vague as to what she considered that to be. On direct examination plaintiff testified that his wife took money he had earned and which was intended for deposit in the bank to pay for living expenses and that she converted it to her own use. She told him that her only interest in him was the money she could get out of him. He testified that he let his property sell under a deed of trust a few months before trial but he could not remember how much it sold for, denied that he received anything from the proceeds of the sale, and denied that he ever saw a check for the money. When confronted with a cancelled check for $3,201, the proceeds of the sale of the mortgaged home, he admitted his endorsement on the back of the check, admitted that he owed $1,060 on the property, but denied that he received any of the proceeds of the $3,201 check and denied that he had an agreement with a Mr. Jenny, whose endorsement also appeared thereon that Mr. Jenny hold the money for him until he "got rid of his troubles" with his wife. Defendant testified that the house was valued at $3,200, that the debt amounted to $1,000, and that plaintiff had borrowed $1,000 from Pete Jenny.
Plaintiff accused his wife of leaving him five or six times and that after each separation (except the last one) he would prevail on her to come back to live with him. He concluded that she deserted him without cause.
He admitted that he had entered two pleas of guilty to charges of assault upon his wife, the last time in July, 1943, which was the month of the final separation. He contended that he was not actually guilty of these charges of assault; that he had never struck her, and undertook to explain away the pleas by saying that he had entered them in order to avoid difficulties and to get his wife to return to him.
Plaintiff testified that he had been paying defendant $40 a month since October 29, 1943, on the separate maintenance judgment until the last two or three months before the trial, when the payments were reduced by court order on his application to $25 per month.
He stated that he had worked at the plate glass factory for 32 years; that he was presently under the doctor's care and had worked only three months in the preceding year; that although he had just gone back to work he did not think he would be able to continue working; that he had no property and depended for his support on his ability to work.
Plaintiff's witness, Dora Graff, lived next door to the parties during all of their married life together, and testified that she had heard Mrs. Dallas call for help on several occasions; that whenever they had a scrap Mrs. Dallas would come over and tell about it, complaining about his abuse of her and that she would run out in the yard and "halloo" for help. She testified that defendant called plaintiff "Hitler; ignoramus, and this and that." Another next door lady, Mrs. Anna Pannier, heard the "hallooing" and screaming, but did not know what it was all about; was not impressed by her cries for help; and did not think it "any of her business." The latter heard no arguments and neither of them saw any mistreatment or evidence of mistreatment. Both ladies testified that plaintiff's reputation was good. His reputation was further vouched for by N. L. Carroll, with whom plaintiff had associated for 32 years.
Barbara Jercilobic, who lived in the neighborhood, stated that plaintiff was a good workingman and a good neighbor *742 who kept his family and that she had paid no attention to defendant's accounts of her domestic troubles.
Although plaintiff had no notice from defendant's pleadings that his drinking habits would be called to account, he no doubt anticipated that this issue would be raised, for all of his witnesses were questioned on direct examination with reference to his drinking, and all of them gave negative testimony with reference thereto. Dora Graff knew nothing about his drinking; Mrs. Pannier saw him almost every day but she never saw him when she thought he was intoxicated; she denied that she knew he "drinks a good deal" and said "I never see people drink." Mr. Carroll stated that he and plaintiff would take a glass of beer on the way home from work but that in 32 years of association he had never seen plaintiff drunk; that plaintiff never got drunk.
Defendant related that after the final separation she had seen an account in the newspaper of a wreck in which plaintiff took part while driving a truck in an intoxicated condition. She knew he drank. She told of various incidents which occurred "while he was drinking"; said "If he had laid off the drinking and kept his mouth shut we would have got along fine." She told briefly of another incident when he came home drinking, "had a knife and he put me in the bathtub." She said he would come home from work smelling with liquor. These brief references to plaintiff's drinking were not corroborated by defendant's witnesses, although plaintiff himself admitted that he drank "some"; that he might have become intoxicated, "but very seldom."
Defendant testified to physical abuse by plaintiff on many occasions; bruises inflicted, kicking her out of bed; knocking her unconscious and standing over her and looking into her face when she recovered consciousness; efforts to kill her, and "threats to finish her for once and all." She said he was jealous; that she could not speak to her neighbors because he was so jealous; that if he ever again caught her speaking to her former husband it would be "too bad"; that he nagged at her about different things commencing about six months after they were married; that plaintiff told her that the only reason he married her was that she was a good housekeeper, that the place was in a terrible shape, and that after she got the place to looking right he intended to kick her out.
She had him arrested three times for assaulting her and her testimony indicates that after these pleas of guilty he would come to her, confess his wrongdoing, promise to control his temper; that she would accede to his request to return to him, whereupon, within a short time, he would commence his drinking and nagging all over again. He accused her of wanting to see that "old man", referring to her former husband. He accused her of using too much electricity in ironing. She further testified "He would call me the ugliest names that ever came out of anyone's mouth. He swore at me continuously." She claimed her health was ruined as a result of his abuse; that she was bruised and kicked around, and that blood poisoning set in from the kicking, necessitating an operation in the course of which "nearly everything inside was removed." There was no medical evidence to support these conclusions on the part of the defendant. Defendant further claimed that she can no longer work, that she faints on the job, and that it has been nearly three years since she had employment.
Defendant's daughter, Irene Scaggs, testified that several times she and her husband brought her mother to their home; that although she had never seen Mr. Dallas strike her mother, she had taken her from the Dallas home when she was marked and bruised "many a time"; that she would have black and blue marks on her arm. She heard Mr. Dallas use "rough" language toward her mother a "couple of times." When pointedly asked what was said on these occasions the witness answered "mostly jealousy" and did not elaborate.
Irene Scaggs' husband, William Scaggs, said that he had never seen plaintiff abuse defendant but that on two occasions he had gone to the home to get Mrs. Dallas *743 and her clothes, and brought her to stay with the Scaggs. He saw a bruise on her arm one time.
In his pleading plaintiff alleged that defendant threatened to kill plaintiff, and tried to use a butcher knife on plaintiff, but plaintiff's evidence did not bear out this claim; on the contrary, plaintiff showed that defendant threatened to kill herself, not him, and was about to cut her own throat. This hardly constitutes an indignity toward plaintiff.
Plaintiff complained that defendant quarreled and nagged, but presented no concrete evidence to support the conclusion.
He complained of her running out into the yard and calling to the neighbors for help, but he did not indicate that this caused him any embarrassment, mental anguish or mortification, and so far as the neighbors are concerned, such antics on her part seemed to have made little impression on them. They did not take it seriously, and paid little attention to it.
His complaints about difficulties over property when analyzed fade away like "temporary visions seen in a dream." He himself said that he voluntarily vested her with a half interest in the house because he "thought it was the right thing to do"; that they had a joint bank account; that she always deposited his checks in that account, "except what was necessary for household expenses"; and that when she separated from him there were $400 in the joint bank account and that "she took her part" and "left his part" in the bank. His petition alleged that defendant frequently suggested to plaintiff that he sell all of his property and give her one-half the proceeds, but when asked this very question on direct examination by his own lawyer, plaintiff denied that she had ever made that suggestion to him, thus disproving his own allegation. When this evidence is taken into consideration along with his evasive and patently unsatisfactory attempt to explain away the $3,201 check with which he was confronted, this court cannot conclude that these charges about money and property were of sufficient gravity to amount to indignities in the legal sense.
The bad names applied to plaintiff, which defendant admits, and the throwing of dishes, which defendant denies, taken together hardly constitute a course of conduct disruptive of the marriage relation and amounting to a species of mental cruelty. If but a small portion of the evidence of plaintiff's misconduct toward defendant were true, such retaliatory actions and blasphemy might be excused on the ground of provocation.
Upon the principal complaint that she left him five or six times, finally "deserting" him, a balancing of considerations and impartial view of the plaintiff's evidence, along with the undisputed facts, drives us to the conclusion that the merits of this issue are with defendant. Plaintiff cannot account for her leaving. He said she "just picked up and left." If plaintiff had been treating her with the love, kindness and affection which he professed at the trial, it would indeed be strange under such circumstances for this woman to have left without cause. It stretches credulity beyond the believing point, especially when coupled with his admission that at least twice he had plead guilty to charges of physical assault upon his wife. His weak effort to escape the force of these indictments of his innocence, in which he claims that although not guilty he entered such pleas to save trouble and to get her to return to him, is rejected. Much more consistent with normal experience is the explanation of the wife that she left him because he abused her. The convictions of assault, which are admittedly true, buttress her explanation of her leaving the home, effectively break down his claim of desertion without just cause, and deprive plaintiff of the status of innocence. The convicted wife-beater who seeks a divorce finds no favor in the divorce courts. Libbe v. Libbe, 157 Mo.App. 701, 138 S.W. 685; Miles v. Miles, Mo.App., 54 S.W.2d 741.
This, together with the admission that from October 29, 1943, until November 30, 1948, he had paid his wife a substantial *744 sum each month for separate maintenance under a judgment in her favor and against him, which as we shall see, infra, necessarily adjudicated the issues of desertion against him, make wholly untenable his position here as an "innocent and injured" applicant for divorce on the ground of desertion.
Thus it appears that plaintiff failed to sustain the burden of proving a series of indignities of sufficient gravity as to amount to a species of mental cruelty disruptive of the conjugal relation, making his condition intolerable, failed to establish his innocence, and proved himself out of court by setting up his own impediment to a finding of desertion.
The first two grounds of her appeal are accordingly resolved in favor of appellant.
Turning now to the question whether the action is barred on the theory of res adjudicata, it appears that the first intimation of prior litigation between these parties in connection with their domestic relations is a reference thereto in paragraph 3 of plaintiff's petition wherein he alleged that "plaintiff has been contributing to the support of defendant under a separate maintenance judgment since the 29th day of October, 1943, at the rate of $40.00 per month." Defendant raised the defense of res adjudicata at the first opportunity by motion to dismiss, which she supported by evidence elicited from plaintiff himself, in which he revealed that he was the defendant in the separate maintenance suit; that he testified in that case; that the testimony he gave in that case would be "just the same as the testimony you (he) would give in the case for divorce" (parentheses ours); that in that case Mrs. Dallas testified as to his treatment of her and he testified on the contrary "as to why she should not be granted separate support"; that his testimony in the divorce case would be just the same as his testimony was in the separate maintenance suit; that no new or additional facts had come up since that time; that plaintiff had not seen defendant since the time of the trial in 1943.
Overruled at this stage of the proceedings, defendant filed an answer raising the defense of res adjudicata. At the beginning of the taking of the evidence at the trial proper, defendant kept the issue alive by objecting to the introduction of any evidence. This objection was overruled. The point was preserved in the motion for new trial.
The party relying on the defense of res adjudicata has the burden of proving the existence of the prior adjudication and the exact nature of the issue previously adjudicated, unless he is relieved of that burden by the adverse party. 50 C.J.S., Judgments, § 837, p. 405.
The accepted and conventional method of making such proof is to introduce in evidence the record of the pleadings and judgment entry in the prior litigation. In the case at bar we have an unusual situation, in that the plaintiff himself (the unsuccessful party in the previous litigation) introduced the subject into the lawsuit, and in that neither the party relying on the defense of res adjudicata (defendant herein) nor the party challenging the effect of the prior judgment (plaintiff herein) has seen fit to introduce into this record either the pleadings or the judgment rendered in the prior litigation. We are not, however, left in the dark about the matter, for plaintiff, by his own solemn assertions in his petition, and in his oral testimony at the hearing of the motion to dismiss, has admitted that a judgment for separate maintenance was rendered, and has thereby relieved the party relying upon the defense of res adjudicata of the burden of making other or further proof of the existence of the judgment.
In addition, it must be observed that defendant's answer alleges "that in 1943 this court, after hearing a cause in which defendant herein sued plaintiff herein for separate support * * * awarded allowance for separate support * * *; that all of the matters, allegations and statements contained in plaintiff's petition have previously been adjudicated in favor of defendant; that on or about the _____ day of April, 1949, defendant testified in this court on a motion to dismiss plaintiff's petition that all of the evidence and testimony he had given and produced in *745 his contest of a suit for separate support filed by defendant in this case and tried by this court on the _____ day of _____, 1943. Defendant states that the court's decision at that time was in her favor and that plaintiff in this cause has ever since said date paid to defendant herein the sum of forty dollars ($40.00) per month for separate maintenance which was the amount assessed by the court * * *."
No reply to this answer was filed by plaintiff. Well pleaded res adjudicata matters standing undenied in the answer must be taken as true. McIntosh v. Foulke, Mo. Sup.1950, 228 S.W.2d 757.
Plaintiff raised no issue of fact as to the existence of the former judgment, nor did he introduce any evidence tending to deny, discredit or discount it. Quite to the contrary, he thrice admitted it: by his petition, by his oral testimony, and by his failure to reply to the answer asserting it.
In this situation we rule that the fact that a judgment of separate maintenance was rendered in the Circuit Court of Jefferson County, Missouri, on October 29, 1943, in favor of Emma J. Dallas and against Christopher M. Dallas, awarding her the sum of $40 per month for maintenance, is established.
The legal effect of that judgment is now to be considered.
In Meyer v. Meyer, Mo.App., 236 S.W. 382, it was decided that in a suit for divorce wherein the issue is desertion, a prior judgment in a separate maintenance suit between the same parties is res adjudicata on the question of abandonment, and we reannounce that rule in this case.
The existence of the following facts is a basic prerequisite to the entry of a judgment for the wife in a separate maintenance suit: (1) that the husband, without just cause, abandoned the wife, or was guilty of such misconduct as to justify her leaving him, Hoynes v. Hoynes, Mo.App., 218 S.W.2d 823; Obermire v. Obermire, Mo.App. 1950, 232 S.W.2d 205; (2) that the wife had sufficient grounds to entitle her to a decree of divorce if that were the relief she was seeking, State ex rel. Fawkes v. Bland, 357 Mo. 634, 210 S.W.2d 31; Obermire v. Obermire, supra. A judgment for the wife in such a suit cannot legally and properly be rendered unless the court finds these facts, which are inherent in a separate maintenance judgment.
Since it has been established that a judgment in favor of the wife for separate maintenance was rendered, it necessarily and inevitably follows, in the absence of a showing to the contrary, that the court passed upon and adjudicated the fundamental issues of desertion and innocence. There is a presumption of right action on the part of courts of general jurisdiction in the performance of their duties. Brinkerhoff-Faris Trust & Savings Co. v. Gaskill, 356 Mo. 61, 210 S. W.2d 274. It is presumed that the court in the separate maintenance action entered its judgment only after making findings of the essential constituent elements of a cause of action for separate maintenance.
A further rule aids appellant, namely, that judgments are conclusive in subsequent actions between the same parties on the same cause of action of all matters which were or might have been litigated in the previous action. Koontz v. Whitaker, Mo.App., 111 S.W.2d 197; Autenrieth v. Bartley, 238 Mo.App. 55, 176 S.W.2d 546; Boatmen's Nat. Bank of St. Louis v. Bolles, 356 Mo. 489, 202 S.W. 2d 53.
Respondent answers, however, on oral argument, that the former judgment was not final. A "judgment" has been defined by the General Assembly as "the final determination of the right of the parties in the action." R.S.Mo.1939, § 1236, Mo.R.S.A. § 1236. Where the existence of a previous judgment between the same parties on the same cause of action is alleged and established, the burden is upon the party attacking it to allege and prove that it was not final. There is nothing in the pleadings or evidence to support this contention.
Respondent further asserts that the former judgment is no bar because the record in this case shows that the parties separated in July, 1943, so that *746 at the time the former judgment was rendered on October 29, 1943, the parties had been separated less than one year, and, therefore, neither party could have had statutory grounds for desertion at that time. It is true that a judgment cannot be made the basis for an estoppel as to facts which did not occur until after the judgment was rendered, but this rule has no application here for the reason that one of the foundation stones of the 1943 judgment necessarily must have been that the husband deserted the wife, or that the wife was justified in leaving him for his misconduct. That being true, respondent could not possibly have had any rights on October 29, 1943, arising out of the separation of the parties which might thereafter have ripened into a cause of action for desertion by the passage of time. That he had no such rights is implicit in the judgment of October 29, 1943.
The court below should have sustained the plea of res adjudicata.
For the reasons given, the judgment of the trial court is reversed, and the cause is remanded with directions to set aside its judgment granting a divorce to plaintiff, and enter its judgment for the defendant, dismissing plaintiff's petition. It is so ordered.
ANDERSON, P. J., and McCULLEN, J., concur.