Howard F. EIKERMANN,
(Plaintiff) Appellant,

v.

Anita EIKERMANN, (Defendant)
Respondent.

No. 29162.

St. Louis Court of Appeals. Missouri.

Nov. 15, 1955.

S. W. James, Jr., Jefferson City, for appellant.

Wm. H. Wessel, Hermann, for respondent.

WOLFE, Commissioner.

This action for divorce was brought by Howard F. Eikermann. His wife, Anita, also sought a divorce by a cross bill. The trial resulted in a judgment dismissing the plaintiff's petition and granting a divorce to the defendant. The court also awarded the defendant the custody of a minor child born of the marriage and ordered the payment of thirty dollars per month for the support of the child. The plaintiff prosecutes this appeal.

The parties were married on November 8, 1947. Mrs. Eikermann had been married before and had a daughter who was about five years of age at the time of the marriage to Eikermann. After their marriage they lived with the parents of Eikermann on a farm in Gasconade County, Missouri. At the time that they were living there Eikermann's parents were building a new house about four hundred feet west

of the one they occupied. After completion of the new house his parents moved into it and he and his wife continued to live in the old house.

Howard Eikermann was a farmer. He owned no land himself but farmed eighty acres of rented bottom land. At the time of the trial he owned a tractor, combine, and all of the tools necessary for farming, and in addition to this he had nine head of cattle and seven calves. His estimated income for the twelve months preceding the trial had been about $1400. During most of the time that the parties lived together Mrs. Eikermann was intermittently employed at some sort of factory work in nearby towns. With her earnings she bought groceries and things for the house, such as a new stove and linoleum floor coverings. She stated that her husband never gave her money for any purpose but kept all that he earned by his farming and that she was obliged to work to provide food and clothing for the family.

Eikermann, on the other hand, testified that all of the money he took in was placed in a cupboard to which the defendant had access and he assumed that purchases made came from such money. Several checks were offered in evidence which were payable to Howard Eikermann and one to B. Eikermann. The checks totaled $325.86, and each one bore what purported to be the endorsement of the payee. Eikermann testified that Mrs. Eikermann had endorsed the checks and got the proceeds of them. Mrs. Eikermann said that she endorsed only one of them. Photostatic copies of the checks were put in evidence. Eikermann's statement that the checks were all endorsed by his wife was corroborated by an expert witness. The checks in question were all from the Independent Packing Company and were given in payment for livestock. Eikermann stated that he did not want his wife employed outside his home but Mrs. Eikermann stated his objection to her working was only "toward the last".

Eikermann testified that his wife was a good wife until the fall of 1951, when a man named Michael Lamprecht started coming over to visit her. Lamprecht lived on a three-acre tract of land fronting on the same road where the houses of Eikermann and his parents stood, the house of Eikermann's parents being between Lamprecht's place and Eikermann's place. Eikermann testified that while he was away from home his wife had frequent visits from Lamprecht and that she returned the visits by going to Lamprecht's house on a number of occasions. He also said that twice she had taken Lamprecht for a ride in their automobile. At this time Mrs. Eikermann was about thirty-one years of age and according to Eikermann Lamprecht was in his sixties, but was a person of lecherous intentions. Eikermann told his wife he did not want Lamprecht around the house but she informed him that if he wanted Lamprecht to stay away he would have to tell him that himself. As to her visits to Lamprecht's house she stated that she only went there on two occasions, once to help cut wood with some other people, and another time to help put up a storm sash. As to the time she took Lamprecht in her automobile she stated that they went once to Linn to buy storm sash and that her daughter was with her, and another time she drove Lamprecht and her brother to Jefferson City. Eikermann's mother testified that she had seen her daughter-in-law at Lamprecht's place on a number of occasions.

Eikermann testified that over his protest his wife frequented a tavern known as Shady Acres and that she attended dances there on Saturday nights. He went with her and sat outside in their car with the children while she danced, and it was usually between 12:00 and 1:30 before she left. He named two men whom she seemed to favor with dances and stated that he protested with her about going to these dances. But, as Mrs. Eikermann testified, she told him she worked all week and was going to have some fun on Saturday night.

Lamprecht sold his place and moved but visited Mrs. Eikermann's sister who lived nearby and he stayed there on weekends. Mrs. Eikermann also visited her sister on

weekends. She said her husband did not go with her because he was not allowed there.

There was evidence that both of the parties cursed the children at times. Both charged that the other did but denied that they did it themselves. Mrs. Eikermann testified that her husband cursed her and called her names and said that she never called her husband any names unless he cursed her first and then she only repeated the same epithets she had received. One witness, who was at the time a law student at Washington University in St. Louis, testified that he went fishing frequently from Eikermann's place. He said that on one trip there for that purpose he passed close by Eikermann's house and that the Eikermanns and their children were in the yard. As he approached the house he heard Mrs. Eikermann loudly hurling invectives at her husband. He related what he had heard and it is sufficient to say that it consisted of the lowest and most degrading obscenities that could be uttered. He said that Eikermann made no reply to the tirade and the witness went on to the river without making his presence known.

Mrs. Eikermann testified that she became pregnant on two occasions after the birth of their son and that Eikermann told her that they could not afford to have any more children and insisted that she have abortions performed. She said that he took her first to a doctor near Sedalia where she had previously worked and the second time to a doctor in St. Louis. Eikermann admitted that he went with her on both occasions but stated that he did not do it on his own initiative but at her request, and that he did not suggest either abortion.

Eikermann testified that up to a year prior to their separation their sexual relations had been satisfactory but that for a year before their separation his wife had refused to have sexual intercourse with him. Mrs. Eikermann said that this was true and as her reason stated that Eikermann refused to take her to a doctor after her last miscarriage.

There was evidence that Eikermann and two friends of his had trailed Mrs. Eikermann's car one night as it left the town of Chamois. Eikermann and his friends stated that Mrs. Eikermann was following a truck driven by a man named Ferguson and as both vehicles reached a private road some distance from the town they turned off and parked. When the three following them later came up to Mrs. Eikermann's car they said it was parked behind Ferguson's truck and that she and Ferguson were in the front seat of her car. They said that she was seated on the left and that Ferguson seated on the right had his arm over the back of the seat with his right hand on her shoulder. They also said that she was leaning toward Ferguson. Her version of the occurrence was that Ferguson told her that Eikermann wanted him to talk to her about coming back and that they couldn't talk in Chamois because Eikermann had asked everyone he knew to spy on her so they drove out of town. She said that she was leaning forward to adjust a seat cushion when her husband and his friends turned a flashlight on her. Her four-year old son was with them and standing behind the front seat.

Ferguson testified Eikermann had asked him to talk to Mrs. Eikermann about a reconciliation and that that was the purpose of the trip. He said that he was rolling a cigarette at the time Eikermann and his friends came upon them.

When Mrs. Eikermann left she took their son with her and at the time of the trial she and the boy were living with her brother who was divorced and unemployed. Eikermann had moved in with his mother and father who expressed a willingness and a desire to have the child live with them. Eikermann had not seen the child since the separation but he had tried on two occasions to do so. He stated that he did not know whether or not it was proper for him to attempt to see it while the divorce was pending.

The testimony taken was quite extensive, but the above constitutes all the pertinent facts and it was upon these facts that the

trial court awarded Mrs. Eikermann a divorce.

 In reviewing the evidence in a divorce case it is our duty to reach our own conclusions on the facts and it is our ultimate responsibility to direct the entry of such decree as in our opinion is justly warranted by the evidence. When the evidence is conflicting and the truth can best be determined by the conduct and demeanor of the witnesses on the stand, we defer to the trial judge who had the advantage of seeing them. Rusche v. Rusche, Mo.App., 200 S.W.2d 577; Luckett v. Luckett, Mo.App., 263 S.W.2d 41; Dallas v. Dallas, Mo.App., 233 S.W.2d 738.

Examining the case, as to the cross bill upon which the defendant prevailed, we find that she alleges that she had been subjected to indignities at the hands of the plaintiff which rendered her condition as his wife intolerable. She pleaded numerous charges, including habitual drunkenness, adultery, cursing, nonsupport, falsely accusing her of associating with other men, forcing her to have abortions, forging checks, etc. There was no attempt to prove adultery and she herself testified that the defendant had quit drinking over a year before the divorce action. The indignities upon which she attempted to submit proof and upon which she rested her case are diminished to her charges that her husband forced her to have two abortions, he did not support her, and that he cursed her and the children.

 As to the abortions; it is obvious from the record that the defendant was the dominant party of the two; she admittedly did as she pleased over her husband's protests and from this it seems apparent she was not forced to do anything that she did not want to do. On the question of their finances there can be no doubt that the cash income from Eikermann's farm was small, but we cannot accept defendant's statement that he gave her no money. The checks in question were apparently given to her and endorsed by her. A qualified expert so testified and no possible reason was advanced as to why the payee of the checks would attempt to sign them so that the endorsement would appear exactly like Mrs. Eikermann's writing. It is true that Eikermann's earnings were small, but there is no evidence that he did not farm industriously and do the best he could with what he had. The truth of the other charge that he cursed her and the children rests entirely upon the credibility of the witnesses and could best be determined by the trial judge. The cursing which was set out verbatim was the common variety lamentably not unusual between these two, and therefore must not have been particularly shocking to them. From this it would appear that the defendant failed to prove that she had been subjected to indignities that rendered her condition as plaintiff's wife intolerable. She, of course, also had the burden of proving that she was the innocent party before she could be awarded a decree. Whether or not she was can best be resolved by considering the plaintiff's case.

Eikermann stated that his wife kept his home clean and was a good wife until Lamprecht moved near. He knew Lamprecht was living apart from his own wife and did not want him to visit with Mrs. Eikermann. In spite of this, Mrs. Eikermann kept up the association and admittedly did go at times to Lamprecht's house. She knew that this conduct, no matter how innocent it may have been, did not meet with the approval of her husband. To make matters worse, after Lamprecht moved she spent weekends visiting her sister at the same time Lamprecht was there. She said that her husband did not go with her on these occasions because he was not allowed on her sister's place. This conduct coupled with her admitted refusal to have any relations with her husband aroused in his mind suspicion that her association with Lamprecht and others was adulterous. The fact that he asked friends and acquaintances to watch her did him no credit, but if her conduct was proper it did her no harm. She certainly imposed indignities upon him of which he had just cause to complain. As to her admitted re-

fusal to have sexual relations with her husband, she stated that her refusal arose out of the fact that he did not take her to a doctor. This is absurd in face of all the evidence. She was the one who drove the car all the time and, incidentally, took it with her when she left so there was no lack of transportation and if she needed medical attention there was nothing to stop her from getting it. As to the quarreling and swearing the witness who told of hearing her as he passed her place to go fishing was not discredited and the billingsgate that he heard coming from her in the presence of her children was far worse than any swearing that she charged to her husband.

■ The equities appear to have been with the plaintiff and from all of the foregoing it seems that the cross bill should have been dismissed and the decree granted to him.

This leaves us to consider who should have the custody of the son born of the marriage. Eikermann is now living with his parents who apparently are people of good character. They live in a relatively new six-room house. The child spent much of his time with them before his parents were separated and both of Eikermann's parents expressed great affection for the child. It is to this home that the boy would be taken if the father were awarded custody.

■ Since the separation the boy has been living, as stated, with Mrs. Eikermann's brother, who is divorced, unemployed, and at the time of trial was living on unemployment compensation. There was little beyond these facts to give any idea of the environment in which the child was living. In view of this, it appears that the best interest of the child would be served if his custody was awarded to his father.

For the reasons stated, it is the recommendation of your Commissioner that the judgment of the trial court be reversed and that the cause be remanded with directions to dismiss the defendant's cross bill and award the plaintiff a divorce with custody of their minor child, and that the defendant be given a right to visit the child at reasonable hours.

PER CURIAM.

The foregoing opinion of WOLFE, C., is adopted as the opinion of the court.

The judgment of the circuit court is accordingly reversed and the cause remanded with directions in accordance with the recommendation of the Commissioner.

ANDERSON, P. J., MATTHES, J., and SAM C. BLAIR, Special Judge, concur.