Vivian I. SCHULER (Plaintiff), Appellant,

v.

Frederick L. SCHULER, non compos mentis, and Robert C. Reis, Guardian of the Person and Estate of Frederick L. Schuler, non compos mentis (Defendants), Respondents.

No. 30047.

St. Louis Court of Appeals.

Missouri.

Nov. 5, 1958.

Boggiano & Hessel, Stephen A. Boggiano, St. Louis, for appellant.

R. C. Reis, St. Louis, for respondents.

WOLFE, Judge.

This is an action for divorce in which the plaintiff charges numerous indignities. The defendant, who is a person of unsound mind, was represented by his duly appointed guardian, who alleged that the defendant was insane at the time the acts, of which complaint is made, were committed. There was a decree for the defendant and the plaintiff prosecutes this appeal.

Once before this case came here upon an appeal by the plaintiff from a similar decree and we held that the indignities proven were sufficient to warrant an award for plaintiff. We also held that there was insufficient proof that the defendant was insane at the time the indignities were committed, but we remanded the case so that the guardian might offer more evidence on that issue. Schuler v. Schuler, Mo.App., 290 S.W.2d 192.

Upon retrial it was shown that the parties were married on October 25, 1919, in the City of St. Louis. The plaintiff, testified that two years after their marriage defendant would at times beat her, choke her, and knock her down. She said that this occurred intermittingly from 1921 to the date of their final separation in 1938.

The plaintiff left the defendant in 1921 for a period of about two weeks after which they again resumed the relationship of husband and wife.

In 1923, the plaintiff was in need of an operation for which the defendant refused

to pay. Her mother gave her the necessary money and this angered the defendant. On this occasion he knocked her down twice and she again left him for three or four weeks. After her return he struck her again and she left for another week.

In 1925, a son was born of the marriage. That same year the defendant started to associate with other women. When the plaintiff charged him with this, he told her it was none of her business. He choked her and called her vile names. Late in that year they again separated.

Again they were reunited and the same abuses were repeated. They need not be further detailed, except as they relate to the issue of defendant's sanity. The plaintiff separated from the defendant on four subsequent occasions up to 1936. After each separation the defendant would promise not to mistreat the plaintiff and to discontinue his association with other women and the plaintiff would return. Despite the promises the defendant's conduct would continue as before.

In 1938, the parties were living with plaintiff's mother when a woman with whom the defendant had been associating came to the house and engaged the defendant in an argument about money. She was contending that she had loaned him money which he had not repaid. The plaintiff's mother ordered them both from the house and that was the final separation of the plaintiff and defendant.

In 1938, after the separation, the defendant telephoned his wife and told her that some men were preventing him from getting back to work at his old position with the Missouri Pacific Railroad Company and that he was going to go down with a gun and see what he could do. She warned the men to whom he had referred and when he arrived at their office he was arrested. He had no gun, but he was taken to the observation ward of the City Hospital. Later that year he was adjudicated of unsound mind and confined.

The plaintiff said that her husband had never done anything, prior to the threatened shooting, which would indicate that he was a person of unsound mind. She said that in her opinion he was sane prior to his confinement. Their son also testified that he considered his father to be a person of sound mind. Two men with whom the defendant had worked at the Missouri Pacific Railroad Company testified on behalf of the plaintiff. They had worked with the defendant in the rate department from 1922 to 1935 and they both said that they considered the defendant to be a person of sound mind. They stated, however, that in the last few years of defendant's service with the company he became moody and irritable. He violated a no-smoking rule of the company and would put his feet on his desk. Both of these witnesses stated that they considered him to be a person of sound mind.

A dentist who had treated the defendant for about ten years up to 1935 stated that from his observation and conversations with the defendant he was of the opinion that the defendant was of sound mind.

Two other men who had worked with defendant were called as witnesses for the defense and both of them stated that in the latter years of his employment he became irascible and insubordinate; that at times he mumbled to himself and threw things on the floor. One of these witnesses stated that he could not say that the defendant was of unsound mind. The other thought that at times he did not seem to be of sound mind but he thought that the defendant knew what was right and what was wrong.

Dr. Walter L. Moore, superintendent of the St. Louis State Hospital and a specialist in psychiatry, was called by the defense. He was asked a long hypothetical question which embraced within it statements alleged to have been made by the plaintiff relative to the defendant's conduct prior to his admission to the hospital. These statements are more fully discussed in Schuler v. Schuler, Mo.App., 290 S.W.2d 192, and

need not here be restated. The question asked was as follows:

"Q. Doctor, I would like to ask you a hypothetical question. I would like for you to assume the following facts: Assume that a man thirty-five or thirty-six years old in 1938 was admitted to the St. Louis City Hospital and later transferred to the St. Louis City Sanitarium, and assume further that this man at about nineteen years of age in 1919 was married, and about three years after the marriage he started to mistreat his wife, and that that mistreatment continued on many occasions, and that the mistreatment consisted of beating and choking her, knocking her down, blackening her eyes; that during the course of their marriage from that time on until 1938 the man on numerous occasions became very angry—when he became very angry had uncontrollable temper, used vile language; that on occasions he would pull his wife from the bed and put her out in the hall—this occurred during the night while she was sleeping; that approximately 1932 the husband tried to get his wife to commit pervert sex acts by mouth; that approximately 1935 he molested a small boy of theirs by handling the boy's genital organs during the night while they were in bed; that on one occasion he took his wife to Baltimore on a bus, and before he got there he told his wife the bus had gone off the road and the bus company was trying to get him; and on certain occasions when this couple's child was a baby he would take the baby's hands and feet in his hands and squeeze them until the child would scream out in pain, and then he would seem to get a most peculiar look on his face and he would smile, and his teeth were bared; and on one occasion while his wife was sleeping he poured ice water in her ear, and when asked what he was doing he said, 'I was trying to see what

you would do.' Further assume that this man was an employe of a railroad as freight rate clerk, and that he had worked for this company from approximately 1923 to 1936, and during the course of his employment during the last two or three or four years of his employment he became very irritable toward his fellow employes; that the fellow employes when talking to him about matters would get very short answers; that he would become very excited and that as a result of this excitement he would sometimes sit down and say nothing and just be in a bad mood, and sometimes sit at his desk and grumble, and on other occasions he would throw books off the desk and pick up the pins and throw them on the floor; that on one occasion he threatened to kill his immediate superior; and that on one occasion just prior to his being committed to the St. Louis State Hospital he called his wife and told her that he was going down to the office of the Railroad Brotherhood workers and kill the people there because they weren't able to get him a job; that on several occasions, in violation of rule about smoking, he smoked during the time that he was to work, and when his superior called him about it he mumbled at his superior and told him to go to hell; that on one occasion his immediate superior sent for him to come into his office, and this man told the person asking him to go to the superior's office that, 'If Mr. Malcolm wants to see me tell him to come out and see me', and then proceeded to put his feet up on the desk and do nothing. Now, assume all those things, Doctor, and also take into account the facts that you were able to obtain in the course of your examination and observation of this man; also take into account your diagnosis of the man's case. Assuming those facts, Doctor, I will ask you whether you have an opinion as to

whether or not this man was of sound mind or unsound mind prior to July 4, 1938, when he was admitted to the St. Louis City Sanitarium."

In answer to the above question the doctor stated that in his opinion the defendant had been insane for some years prior to his admission to the hospital. Upon further questioning he stated that he was of the opinion that the insanity existed for four or five years prior to the defendant's confinement.

The witness further stated that the defendant knew right from wrong and was under no insane compulsions except when suffering from delusions. The delusion to which he referred was that the defendant thought that his wife was unfaithful to him. The doctor reached this conclusion by the statements made by the defendant during his confinement. The witness also said that some of defendant's conduct did not arise from delusions but from a "personality inadequacy".

For about two years after his confinement the defendant worked as an auditor for the hospital and did good work according to this witness. The doctor also said that the fact that the defendant struck his wife, associated with other women, and attempted abnormal sex acts did not necessarily indicate that the defendant was insane or that the acts resulted from insanity. He could not say that the outbursts of defendant were the result of delusions or other things.

Plaintiff in rebuttal called a Dr. Busch, who was a clinical director of the state hospital. He knew the defendant and was on the staff of the hospital at the time of his admission. He testified that for several months after the defendant's admission to the hospital he was able to distinguish between right and wrong and was capable of handling his own affairs. He thought this was also true prior to his admission and that defendant could distinguish right from wrong in all things.

Upon the foregoing evidence there was a finding for the defendant as stated. The judgment of the court denied the plaintiff a decree. The only basis upon which a decree could have been denied was that the defendant was insane at the time the acts complained of were committed. Upon the first appeal of this case, Schuler v. Schuler, Mo.App., 290 S.W.2d 192, 199, we held that the evidence of the indignities committed sustained the plaintiff's action for divorce unless there was a sufficient showing of defendant's insanity, made upon a further hearing. As to the sufficiency of such showing we stated:

"The mere showing of insane delusions, unrestrained impulsiveness and lack of control, psychoneurosis, depraved character or licentious disposition is not sufficient to sustain the defense of insanity in an action of divorce. Willis v. Willis [Mo.App.], supra, 274 S.W.2d [621] loc. cit. 627 et seq., and authorities cited. The insanity 'must be such as deprives the defendant's conduct of the element of wilfulness and as divests the defendant of the use of his reason to the extent of his being unable to differentiate between right and wrong, or that, if capable of so differentiating, defendant must be acting by force of an irresistible impulse generated by a diseased mind and not by volition.' Willis v. Willis, supra, and authorities cited; Niedergerke v. Niedergerke, Mo.App., 271 S.W.2d 204, loc. cit. 207, and authorities cited. There was a complete absence of evidence that the acts complained of were committed by Frederick at times when he was suffering from a mental aberration of such character as to make his conduct involuntary, or to deprive him of the ability to differentiate between right or wrong, or to incapacitate him from willing one course or the other."

The sole proposition before us requires a determination of whether or not

the additional evidence submitted filled the deficiency noted at the first trial. We do this by reaching our own conclusion upon review of the evidence, according due deference to the findings of the trial judge when the credibility of witnesses weighs heavily in a determination of the issues. Dallas v. Dallas, Mo.App., 233 S.W.2d 738; Kinder v. Kinder, Mo.App., 267 S.W.2d 356.

As to the additional evidence offered, there appears to be very little conflict about the facts. The lay testimony as to the sanity of the defendant at the times in question weighs heavily in favor of the plaintiff.

The medical testimony is quite nebulous in character. Although diligently examined by counsel for the defendant, all that could be gathered from Dr. Moore's testimony was that the indignities committed within the last five years could have been insane acts if they were prompted by delusions that the plaintiff was not a faithful wife. There is nothing to indicate that they did arise from such delusions. There is no evidence that the defendant ever charged the plaintiff with infidelity until he was committed to the state hospital.

■ The defendant maintains that the evidence shows that the reunion of the parties in 1936 constituted a condonation of all prior offenses. He asserts that the subsequently committed acts were not the wilful acts of the defendant, and consequently did not revive the former acts of which the plaintiff complains. He seeks to thus limit our consideration on the question of defendant's insanity from 1936 on. That which we have said in relation to the new evidence offered applies with equal force to this period of time. The acts, from the period when they were first committed, fifteen or more years prior to the final separation, were of the same general character, and there is nothing to show that they were acts arising from an insane compulsion or that they were committed by one who did not know right from wrong. It

consequently follows that the evidence remains insufficient to prove that the indignities were not wilfully committed with a full knowledge of their wrong.

For the reasons stated, we reverse the judgment of the trial court and remand the case with directions to enter a decree of divorce for the plaintiff.

RUDDY, P. J., and ANDERSON, J., concur.